IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **MISSISSIPPI PHOSPHATES** | ) | |
| **CORPORATION, *et al.*[1]** | ) | **CASE NO. 14-51667-KMS** |
| | ) | **Chapter 11** |
| | ) | |
| | ) | **(Joint Administration Requested)** |
| **Debtors** | ) | |
| | ) | |

### DECLARATION OF DAVID N. PHELPS IN SUPPORT OF
### THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, *David N. Phelps*, do hereby declare, under penalty of perjury pursuant to 28 U.S.C. §
1746:

1.      My name is David N. Phelps. I am over the age of twenty-one, and I am
competent to make this declaration. I am the Chief Restructuring Officer of Mississippi
Phosphates Corporation, a corporation incorporated under the laws of Delaware ("*MPC*" or the
"*Company*") and its subsidiaries, Ammonia Tank Subsidiary, Inc. ("*ATS*"), incorporated under
the laws of Delaware, and Sulfuric Acid Tanks Subsidiary, Inc. ("*SATS*"), incorporated under
the laws of Delaware.  MPC, ATS and SATS are collectively referred to herein as the "*Debtors*".

2.      I have substantial experience in providing restructuring and reorganization
services both as the Managing Partner of Stillwater Advisory Group, LLC ("*Stillwater*") and,
previously, as a Managing Director and Chief Operating Officer of Bridge Associates, LLC.
Representative cases in which I have provided significant services to Chapter 11 debtors include:

---

[1] The following affiliated Debtors have requested joint administration herein: Mississippi Phosphates
Corporation, Ammonia Tank Subsidiary, Inc. and Sulfuric Acid Tanks, Inc.

TransCom USA, Brill Media Management, Conseco Finance Corp., Wickes, Inc., Impath Inc., Refco LLC, Torch Inc. and Provident Royalties LLC.

3.      Previously, Stillwater was engaged, effective as of January 13, 2014, by Phosphate Holdings, Inc., a Delaware corporation (which is MPC's parent company), its affiliates and subsidiaries (including the Debtors) to provide interim financial management services to that group of companies.  In that capacity, I served as Interim Chief Financial Officer, Director, Secretary and Treasurer of the Debtors and as the Interim Chief Financial Officer and Treasurer of Phosphate Holdings, Inc.  Stillwater's prior engagement concluded substantially in May of 2014 (although Stillwater has continued to provide additional services as requested by Phosphate Holdings, Inc. and the Debtors).

4.      I submit this declaration (the "***Declaration***") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases (the "***Cases***") on October 27, 2014 (the "***Petition Date***") and in support of: (a) the Debtors'  petitions for relief under chapter 11, title 11 of the United States Code (the "***Bankruptcy Code***") and (b) the relief requested in the First Day Motions (*see*  Section VIII, "First Day Relief," *infra*) filed by the Debtors on the Petition Date.

5.      After the Petition Date the Debtors intend to continue to operate and manage their businesses pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code to maintain their going concern value in anticipation of a sale of substantially all of the Debtors' assets pursuant to a Court-approved sales process.[2]  The cash generated from limited production during the initial stage of these Cases and the money loaned to the Debtors under the DIP Loan Agreement will address environmental matters (including water treatment) outlined in Section VI below.  The

---

[2]   The Debtors anticipate filing motions within a week of the Petition Date to establish a formal sales process and to seek authority for the Debtors to sell their assets.

First Day Motions seek relief aimed at minimizing the adverse effects of the chapter 11 filings on the Debtors' businesses. The Debtors have projected in the Approved Budget that there is more than adequate funding to ensure that water treatment of the East gypsum disposal facility and treatment for water and leachate are uninterrupted in the ordinary course of the Debtors' businesses throughout the chapter 11 process.

6.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my personal interaction with fellow members of the Debtors' senior management and other of the Debtors' advisors, my review of relevant documents or business records, or my experience and knowledge of the Debtors' operations and financial conditions. I am authorized to submit this Declaration on behalf of these Debtors.

## I. HISTORY

7.     The history of the Company starts in 1948 when Mississippi Chemical Corporation was incorporated as the first fertilizer cooperative in the United States (the "*Cooperative*"). The principal business of the Cooperative was to provide fertilizer products to its shareholders pursuant to preferred patronage rights, which gave the shareholders the right to purchase fertilizer products and receive a patronage refund with respect to such purchases. On June, 28, 1994, the shareholders of the Cooperative approved a reorganization of the Cooperative, pursuant to which the Cooperative was merged, effective July 1, 1994, into a wholly-owned subsidiary of the Cooperative that was formed on May 23, 1994, as a Mississippi business corporation that became the then-current Mississippi Chemical Corporation ("*MissChem*"). Pursuant to the Cooperative's reorganization, the issued and outstanding shares of capital stock of the Cooperative were converted into shares of common stock and/or cash, and holders of special accounts were offered exchange rights for common stock.

8.      Effective as of July 1, 1994 (the date of the merger described above), MissChem became a publicly held business corporation, and its initial public stock offering occurred on August 16, 1994.  From August 16, 1994, through October 9, 1996, MissChem's stock was traded on the NASDAQ exchange under the symbol "MISS."  On October 10, 1996, MissChem's common stock began trading on the New York Stock Exchange under the symbol "GRO."  On February 10, 2003, MissChem's shares were delisted from the NYSE and began trading on the OTC Bulletin Board through December 2004.

9.      MPC was formed as a Delaware corporation on October 29, 1990.  The Pascagoula, Mississippi DAP facility was originally a NPK granulation facility constructed in 1957 by Coastal Chemical Corporation ("*Coastal*"), the Cooperative's former subsidiary.  In 1972, Coastal merged into the Cooperative.  In 1988, the Cooperative financed the sale of the NPK facility to Nu-South, Inc. ("*Nu-South*"), which converted the plant to a DAP facility.  Nu-South filed bankruptcy in 1990, and as a secured creditor, MissChem acquired the assets through MPC, its wholly-owned subsidiary.

10.     On May 15, 2003, MissChem and its wholly-owned domestic subsidiaries, including MPC, filed petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Mississippi.

11.     Phosphate Holdings, Inc. ("*PHI*") is a Delaware corporation that was formed in December 2004 in connection with the MissChem bankruptcy reorganization.  Pursuant to MissChem's confirmed bankruptcy plan, all the common stock of MPC was issued to the MPC Statutory Trust, a Delaware statutory trust (the "*Trust*") for the benefit of certain creditors of MissChem and MPC, and these creditors received Trust units in exchange for claims against MissChem and MPC.

## II.  CAPITAL STRUCTURE

12.     Immediately after MPC's emergence from bankruptcy, the Trust transferred all of the common stock of MPC to PHI, in exchange for all the common stock of PHI, as outlined in MissChem's confirmed bankruptcy plan.   On June 20, 2007, the Trust unit holders voted to dissolve the Trust, which resulted in the distribution of the PHI shares held by the Trust to the Trust unit holders.  Upon the dissolution and winding up of the Trust in June 2007, each holder of Trust units received five shares of PHI common stock per Trust unit.

13.     ATS is a wholly-owned subsidiary of MPC formed in May 2010.  ATS owns an ammonia storage tank, which stores ammonia used in MPC's production of DAP, as well as the related land, improvements, fixtures, appurtenances, easements and rights.

14.     SATS is a wholly-owned subsidiary of MPC formed in May 2010.  SATS owns a sulfuric acid storage tank, which stores sulfuric acid used in MPC's production of DAP, as well as the related land, improvements, fixtures, appurtenances, easements and rights.

## III.  DESCRIPTION OF THE BUSINESS

15.     MPC is a major United States producer and marketer of diammonium phosphate ("*DAP*"), one of the most common types of phosphate fertilizer.  DAP is MPC's primary product.  To produce DAP, phosphate rock is combined with sulfuric acid to form phosphoric acid, which is then mixed with ammonia to produce DAP, a dry granular product.  In its chemical composition, DAP is comprised of 46 percent phosphate and 18 percent nitrogen.  Of the ammoniated phosphate produced in the United States, 98 percent is sold as fertilizer.  Among other things, phosphate affects seed germination, it helps plants use water efficiently and protects plants against diseases.  Thus, DAP plays an important role in improving crop quality, increasing crop yields and mitigating the effects of environmental stresses on plants.

16.     As of the Petition Date, the Company employed 224 employees and approximately 26 "nested" third-party contract employees.  MPC's production facilities are located on a deep-water channel in Pascagoula, Mississippi, with direct access to the Gulf of Mexico.  The Company's manufacturing facilities consist of two sulfuric acid plants, a phosphoric acid plant and a DAP granulation plant.

17.     In 2013, MPC sold 618,000 tons of DAP at an average price of $394 per ton.  For the year ended December 31, 2013, the Company had net sales of $246.5 million, operating loss of $29.6 million, cash flow from operations of ($29.6) million and EBITDA of ($14.8) million. As of September 30, 2014 (year to date), MPC has (a) sold 343,582 tons of DAP at an average price of $416 per ton, (b) sold 23,295 tons of monoammonium phosphate ("*MAP*") at an average price of $475 per ton, and (c) had miscellaneous terminaling revenue of approximately $1.4 million.  Also, as of September 30, 2014 (year to date), the Company has net sales of $155.6 million, pre-tax operating loss of $33.9 million, cash used in operations of ($22.9) million and EBITDA of ($15.4) million.

## IV.  SUMMARY OF PRE-PETITION FINANCING

18.     On May 6, 2010, the Debtors executed a $25 million credit facility (the "*2010 Credit Facility*") with Transammonia, Inc., the Company's then-largest customer ("*Trammo*"). The 2010 Credit Facility provided for $15 million in revolving loans during an initial two year period, and a $10 million letter of credit sub-facility (which the Company used to guarantee the purchase of phosphate rock from OCP (as defined in paragraph 24 below)).  On May 6, 2012, the revolving credit feature of the 2010 Credit Facility expired and the outstanding balance amortized over eight years.  The 2010 Credit Facility was secured by a lien and security interest on the ammonia and sulfuric acid terminal assets, certain real property underlying the Company's plant site and all personal property of PHI and the Debtors.

19.     After entering into the 2010 Credit Facility, numerous business disputes arose between Trammo and the Company.  Given Trammo's importance to the Company (described in detail below), and the Company's need to keep this relationship in place, the Company was forced to refinance the 2010 Credit Facility.

20.     On September 4, 2013, the Debtors entered into that certain Amended and Restated Credit Agreement, which amended, restated and extended the obligations under the 2010 Credit Facility (the "***Amended and Restated Facility***").  Pursuant to the Amended and Restated Facility, certain lenders advanced $21 million to the Debtors (which included the assumption of all term loan obligations owed to Trammo).  The Amended and Restated Facility - which allowed the Company to favorably renegotiate certain commercial agreements with Trammo (which provided much needed flexibility and avoided a bankruptcy filing), enabled the Company to begin the process of implementing the capital improvements and Turnarounds discussed below, was structured in a way to permit the Company to conserve cash, and provided bridge financing while the Company sought permanent financing - is secured by all collateral securing the 2010 Credit Facility and certain other real estate and related assets.

21.     The Debtors and the lenders have restructured the Amended and Restated Facility four times, each time to provide additional capital to the Debtors: amendments on January 10, 2014 and March 11, 2014 provided $15 million to the Company to complete the interstage tower for the No. 2 sulfuric acid plant, to perform maintenance turnaround on the No. 2 sulfuric acid plant and for other day-to-day operations; an amendment on May 29, 2014 provided $10 million for additional Turnaround efforts; and an amendment on August 8, 2014 provided for a $3 million revolving credit facility.

22.     As of the Petition Date, approximately $58.2 million in principal and interest is outstanding under the Amended and Restated Facility.

23.     In order to permit the Debtors to preserve cash, the lenders structured the Amended and Restated Facility to require payments of interest in kind, rather than in cash, and payment of principal only at maturity (other than certain mandatory prepayments and repayments of the revolver facility).  As a result, the Lenders have not required cash payments of interest or principal under the Amended and Restated Facility, other than two cash payments of interest under the revolver facility in an aggregate amount of approximately $50,000, and periodic repayments of principal under the revolver facility.

## V.  MATERIAL RELATIONSHIPS AND AGREEMENTS

24.     On August 27, 2009, MPC and OCP S.A. ("*OCP*"), a corporation owned by the Kingdom of Morocco, entered into a phosphate rock supply agreement effective as of July 3, 2009 (the "*Supply Agreement*").  Phosphate rock is the primary raw material used to manufacture DAP.  Under the Supply Agreement, MPC agreed to purchase from OCP, on a take-or-pay basis, the phosphate rock requirements of MPC's manufacturing facilities in Pascagoula, Mississippi.  The price of phosphate rock is determined quarterly with a negotiated formula that is based, in part, on related market prices.  MPC and OCP have extended the Supply Agreement through December 31, 2014.  As of the Petition Date, MPC owes $4.7 million to OCP under the Supply Agreement.

25.     On February 27, 2014, MPC and Interoceanic Corporation ("*IOC*") entered into that certain *Marketing Agreement* (the "*Marketing Agreement*"), as amended, in which IOC has the exclusive right and obligation purchase the entire DAP output of MPC, with the exception of 69,000 short tons per year.  IOC remarkets the DAP it purchases from MPC into both the domestic and export markets.  The Company's internal sales staff markets the reserved 69,000

short tons of DAP into the domestic market. Accordingly, IOC is the principal customer of

MPC, accounting for approximately eighty-nine percent (89%) of MPC's annual DAP sales. As

of the Petition Date, MPC's books and records reflect that IOC is a net-debtor to MPC under the

Marketing Agreement as of the Petition Date.

26.     On January 1, 2007, MPC and Trammo entered into that certain *Anhydrous

Ammonia Sales Contract*, as amended (the "***Sales Contract***"), in which MPC agreed to purchase

one hundred percent (100%) of MPC's ammonia requirements from Trammo. On May 6, 2010,

MPC, ATS and Trammo entered into that certain *Ammonia Tank Services Agreement* (the "***Tank***

***Agreement***") in which MPC and ATS agreed to maintain and operate the ammonia tank (the

"***Ammonia Tank***") and the facilities and equipment for loading the ammonia product from and

into rail cars, barges and trucks (the "***Ammonia Terminal***"). On May 6, 2010, MPC and

Trammo entered into that certain *Industrial Lease* (the "***Lease***") whereby MPC agreed to lease

the Ammonia Tank and the Ammonia Terminal exclusively to Trammo (the Sales Contract,

Tank Agreement, and the Lease, collectively, the "***Trammo Agreements***").

27.     Pursuant to the Trammo Agreements, MPC operates and maintains the Ammonia

Tank and the Ammonia Terminal exclusively for Trammo. Approximately forty percent (40%)

of the ammonia stored in the Ammonia Tank is consumed by MPC in its operations and the

remainder is sold by Trammo on the open market. MPC's revenues range from $1.7 million to

over $3 million per annum for the services and facilities provided under the Trammo

Agreements. Under the Lease, Trammo has an option to purchase the Ammonia Tank and the

Ammonia Terminal in the event MPC defaults under the Lease and fails to cure such default

within the requisite time periods (the "***Purchase Option***"). Should the Purchase Option accrue,

Trammo must exercise the Purchase Option within ninety (90) days following occurrence of the event giving rise to the right to exercise.

## VI. ENVIRONMENTAL MATTERS

28.     The Debtors' production facility is subject to state and federal environmental, health and safety statutes and regulations.   Specifically, the Mississippi Department of Environmental Quality ("*MDEQ*") permit to operate the East gypsum disposal facility is conditioned upon the requirement that the Debtors provide financial assurance for payment of the closure, post-closure care and related water treatment costs of the East gypsum disposal facility.  The Company has been meeting this obligation through a sinking fund arrangement whereby the Debtors have made quarterly contributions of $0.2 million into an interest-bearing trust fund for closure, post-closure care and related water treatment costs to be incurred when the capacity of such disposal facility is depleted.  These payments must continue until the funds in the trust, including earnings from trust assets, are sufficient to cover the estimated costs of closure at the completion of the disposal facility's useful life and the post-closure costs for water treatment and leachate.

## VII. EVENTS LEADING TO BANKRUPTCY

29.     Prior to the Petition Date, the cumulative effect of several factors, including natural disasters, market fluctuations, deferred capital expenditures and maintenance, unplanned shutdowns of the production facilities, and unsuccessful planned turnarounds, have had a significant detrimental impact on the Debtors' business operations and, as a result, on their financial condition.  Because the Debtors have only a single production facility, any sustained disruption leading up to bankruptcy had a material adverse effect the Debtors' business, financial condition and operating results.

30.     Phosphate rock is the primary raw material used in the production of DAP, and its production is highly concentrated in four countries (China, the United States, Morocco and Russia), which account for nearly 75 percent of world production. Since 1991, the Debtors have purchased all of their phosphate rock from OCP. This exclusive relationship with OCP results in economic risk. For example, in 2011, severe flooding in Morocco interrupted the Debtors' phosphate rock deliveries in January and February causing the Company to curtail DAP production. In early May, the Company suspended the operation of the DAP granulation plant and phosphoric acid plant for nine days due to further disruptions in phosphate rock deliveries. Thus, in the times when OCP has failed to provide the Debtors with phosphate rock for any reason, the Company has been unable to produce DAP at the Pascagoula plant until a time when the Debtors were able to obtain phosphate rock from an alternate supplier. Obtaining alternate sources of supply for phosphate rock on reasonable terms has been difficult given the Company's lack of liquidity, financial wherewithal, and ability to provide assurance of payment.

31.     The lenders have advanced $49 million under the Amended and Restated Facility to permit the Company to make capital improvements to and perform maintenance of its facilities and operations with the goal of increasing production of DAP and raising cash flow to a viable level (the "*Turnarounds*"). Despite these efforts, the Debtors have not been able to generate positive cash flow during the term of the Amended and Restated Facility due to unforeseen factors, which caused each Turnaround to run over budget and frequently delayed implementation. The Turnarounds caused the Company more downtime than budgeted and, as a result, increased the amount of DAP the Company had to produce to meet its necessary output. Consequently, the desired production goals were never reached following the completion of the Turnarounds.

32.    On September 16, 2014, a waste heat boiler failed in one of the sulfuric acid plants.  This boiler failure resulted in reduced DAP production of 1,000 tons per day, which caused the Company to incur additional expenses in the form of an unplanned cash outlay for repairs, as well as lost revenues from the lowered DAP production.  This loss of revenue from the reduced DAP production, combined with increased repair and maintenance costs, has created a cash shortfall that could not be remedied by increased production levels at the facility's current capacity.  The Company estimated that it needed at least $14 million to address the immediate cash shortfall and in order to properly sustain business operations through March 31, 2015.

33.    To address its capital needs, the investment banking firm of Sandler O'Neill + Partners, L.P. ("***Sandler O'Neill***") was retained earlier this year to seek to bring in additional capital or identify a buyer or a joint venture partner to avert the liquidity crisis the Company was facing.  Sandler O'Neill identified several prospects, and discussions with one prospect progressed earlier this month to that potential buyer's completing its initial due diligence and even exchanging drafts of a Letter of Intent with the Company's professionals.  Unfortunately, on October 19, 2014, that candidate notified the Company that it was withdrawing from the process.

34.    Additionally, representatives from the Company met with various key vendors and constituents to request enhanced credit terms or other financial assistance.  Although some of these vendors have provided valuable short-term concessions, the concessions were not in the aggregate sufficient to avoid the need for the chapter 11 filings.

35.    Despite advancing $49 million to the Company since September 2013 under the Amended and Restated Facility, the Company has not been able to generate sufficient cash to fund its operations and address ongoing environmental requirements.  The lenders were not

willing to make additional loans to fund additional losses outside of the bankruptcy process without participation from other key constituents or new investors. However, the lenders have offered to continue to support the Debtors in the form of their respective commitments to fund the DIP Loan Agreement contemplated herein.

## VIII.  FIRST DAY RELIEF

36.     I have read and reviewed the following First Day Motions (including the exhibits attached thereto) and the allegations contained in each are true and correct to the best of my knowledge, information, and belief:

(a)     *Motion of Debtor for Order Directing Joint Administration of Affiliated Cases Pursuant to Bankruptcy Rule 1015(b)* [Dkt. # ___];

(b)     *Emergency Motion of the Debtors (1) Authorizing Interim Use of Cash Collateral; (2) Providing Adequate Protection under 11 U.S.C. §§ 361 and 363; and (3) Setting Date for Final Hearing on Use of Cash Collateral - Emergency Motion for a Preliminary and Final Order (I) Authorizing Post-Petition Financing on a Secured and Super Priority Basis Pursuant to 11 U.S.C. §§ 105, 361, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 507(b), (II) Granting Other Related Relief and (III) Scheduling a Final Hearing Pursuant to Rule 4001* [Dkt. # ___];

(c)     *Motion of the Debtors for Authority to Pay Certain Pre-Petition Employee Obligations* [Dkt. # ___];

(d)     *Emergency Motion of Debtors for Authority to Maintain Existing Bank Accounts and Cash Management System* [Dkt. # ___];

(e)     *Motion of the Debtors for Interim and Final Orders: (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Amounts Due; (B) Determining that the Utilities*

*are Adequately Assured of Future Payment; (C) Establishing Procedures for Determining Requests for Additional Assurance; and (D) Permitting Utility Companies to Opt Out of the Procedures Established Herein* [Dkt. # \_\_];

(f)      *Motion of the Debtors for Authority to Pay Postpetition Installments on Insurance Policies Necessary to Maintain Insurance Coverage* [Dkt. #]; and

(g)      *Emergency Motion of the Debtors for Expedited Hearings on Certain First Day Motions* [Dkt. # \_\_]

(collectively, the "***First Day Motions***").

37.      **Joint Administration**.  The Debtors believe that many of the motions, applications, hearings and orders that will arise in these Cases will affect all of the Debtors. Under these circumstances, the Debtors believe that the interest of the Debtors, the bankruptcy estates, their creditors and other parties in interest would be best served by the joint administration of these Cases for procedural purposes only.  The Debtors further believe that joint administration of these Cases will ease the administrative burden on the Court by allowing these Cases to be administered as a single joint proceeding instead of those independent Cases. Joint administration of these Cases will also create a centralized location for the numerous documents that are likely to be filed and served in these Cases and for all notices and orders entered by the Court.  A single docket will make it easier for all parties in both Cases to stay apprised of the various matters before the Court. The Debtors will also likely realize substantial cost savings and reduced administrative burdens by sending notices to a single matrix or master service list, as the case may be, rather than maintaining separate notice lists.  For these reasons, the Debtors submit, and I believe, that it is in the best interest of the Debtors, their estates, and

their creditors, and other parties in interest that the Court grant the relief requested in the Joint Administration Motion.

38.     **Post-Petition Financing on a Secured and Super Priority Basis; Use of Cash Collateral**.  Although the Debtors' pre-petition lenders have consented to the use of their cash collateral by the Debtors under the terms described herein and in this DIP Loan Agreement, the Debtors need additional, post-petition financing.  The Debtors are unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. Substantially all the assets of the Debtors are subject to existing liens and security interest in favor of the pre-petition lenders. The Debtors do not have the liquidity or unencumbered assets sufficient to provide adequate protection to the pre-petition lenders to enable a third party lender to prime the pre-petition lenders.

39.     The Debtors and lenders under the DIP Loan Agreement negotiated the DIP Loan Agreement in good faith.  The DIP Facility represents the Debtors' only opportunity under the circumstances to obtain emergency post-petition financing necessary to fund the Debtors' operations in Chapter 11, to continue to address their obligations to address environmental concerns, and to ensure that the Debtors' value as a going concern is preserved.  I believe the DIP Loan Agreement results from the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitutes a transaction for reasonably equivalent and fair consideration.

40.     The proposed DIP Loan Agreement is required to allow the Company to operate in the ordinary course of business to produce and sell DAP. The Debtors intend to use existing phosphorus rock inventory and buy other necessary product to produce the DAP through November 30 2014 pursuant to a budget generated by the Debtors and approved by the lenders

under the DIP Loan Agreement (the "***Approved Budget***").  I assisted and advised the Debtors'

management in the preparation of the Approved Budget and in analyzing the assumptions used

for the Approved Budget. A copy of the Approved Budget is attached to this Declaration as

Exhibit A.

      (a)    I believe financing is not available from other sources on equally

favorable terms.  The DIP Facility is the most efficient, lease expensive mechanism

available to meet the Debtors' immediate short-term needs.  I believe the DIP Facility

provides the Debtors with the best available opportunity to maximize liquidity and

working capital.  I also believe that finding new financing from other sources, even if

possible, would likely be markedly more expensive and potentially disruptive to the

Debtors' estates and businesses, and at this point in time, threaten the viability of the

Debtors' ability to maximize the value of the bankruptcy estates.

      (b)    The Debtors submit they have an immediate need for financing pursuant

to the DIP Facility and the DIP Loan Documents.  The DIP Facility will allow the

Debtors to continue to finance their day-to-day operations without interruption and

continue to address environmental issues.  I believe that without immediate authority to

obtain financing on the terms and conditions set forth in the DIP Loan Agreement, the

Debtors will be unable to meet their costs and expenses of operation, which would cause

immediate and irreparable harm to the bankruptcy estates.

      (c)    Further, I believe that in order to preserve the value of the Debtors' assets

and the Debtors' ability to manage the bankruptcy estates for the benefit of creditors and

other parties in interest, the Debtors should be granted the authorization to obtain

financing under the DIP Loan Agreement on an interim basis as necessary to avoid

immediate and irreparable harm to the bankruptcy estates pending a final appeal on that particular Motion.

(d)     The Debtors should, in connection with and in addition to the DIP Facility, be permitted on an interim basis in accordance with the specific terms and conditions contained in the DIP Loan Documents, to use cash that constitutes the Pre-petition lenders Cash Collateral as well as the cash that constitutes cash collateral of the DIP Lenders consistent with and subject to the DIP Budget.

(e)     I believe the Debtors have an immediate need to use Cash Collateral for the purpose of meeting necessary expenses incurred in the ordinary course of its business, including payroll, costs of continued production of DAP, addressing the Debtors' environmental issues, and the costs associated with its restructuring and these proceedings.  Further, I believe the inability of the Debtors to use the Cash Collateral would likely result in an immediate cessation of the ongoing operations of the Debtors' businesses, the cessation of ongoing efforts by the Debtors to address environmental issues, and would most certainly cause irreparable harm to the Debtors, the bankruptcy estates and creditors and other parties-in-interest.

(f)     The Debtors submit their continued use of the Cash Collateral and the use of the DIP Facility proceeds on the terms contained in the Interim Order are the only sources of funding of the Debtors' ongoing operations and further, it is in the best interests of the Debtors, all of their creditors and the bankruptcy estates to permit the Debtors to continue to use the Cash Collateral, and such continued use imposes no prejudice or harm on any party-in-interest.

(g)     The Debtors request that all Cash Collateral now existing and hereafter acquired will be deposited and maintained by the Debtors in the ordinary course of their businesses consistent with their pre-petition practices (which is more specifically set forth in the Debtors' *Emergency Motion for Authorization to Maintain Pre-Petition Bank Accounts and Cash Management System*) and the provisions of the Interim Order.

(h)     I firmly believe this relief is necessary in order to avoid immediate and irreparable harm to the bankruptcy estates and to parties-in-interest in the Debtors' chapter 11 cases, and to allow the Debtors to continue to address environmental issues. Accordingly, the Debtors have an urgent and immediate need to use Cash Collateral to continue their business operations while prosecuting Cases.

41.     **Authority to Pay Certain Pre-Petition Employee Obligations**.  The Debtors request the entry of an order pursuant to Sections 105(a) and .507(a) of the Bankruptcy Code authorizing the Debtors, in accordance with their stated policies, (i) to pay their Employees as of the Petition Date the wages and salaries owed to them for work performed prepetition, none of which exceed $12,475 per Employee; (ii) to pay PTO according to amounts and the timetable set forth in the proposed Approved Budget; (iii) to pay customary business expenses only owed to current Employees; (iv) to pay employee deductions to the appropriate third party recipients; (v) to pay the TPA for allowed claims of Covered Persons under the self-funded Health Plan, as well as ordinary matching contributions to the Employees' 401(k) retirement plans and the regular and ordinary portion of the Employees' health, disability, dental and/or other similar items; and (vi) to pay to PHI the salaries and related benefits for the four Retained Personnel in its normal and customary practice pursuant to the Management Services Agreement with its parent, PHI, all

as set forth in the *Motion for Authority to Pay Certain Pre-Petition Employee Obligations* (the

"***Employees Motion***").

(a)     Pursuant to the Employees Motion, the Debtors are seeking authority to

honor and pay all pre-petition employee wages, salaries and other accrued compensation,

and to continue to honor certain other policies, programs and benefits the Debtors provide

to their employees in the ordinary course of business.

(b)     As of the Petition Date, the Debtors have a current work force of

approximately 250 employees ("***Employees***"), broken into 224 regular employees and

approximately 26 "nested" third-party contract employees.  The Employees possess the

institutional knowledge, experience, and skills necessary to support maximizing the value

of the Debtors' business operations through the marketing process.  The uninterrupted

continuation of the Debtors' businesses through the initial stages of the Cases is critically

dependent upon a stable work force.  I believe that any significant number of Employee

departures or deterioration in morale at this time will immediately and substantially

adversely impact the Debtors' businesses and result in immediate and irreparable harm to

the bankruptcy estates and their creditors.  There is a real, imminent risk that if the

Debtors are not authorized to continue to honor their pre-petition Employee Obligations

in the ordinary course, the Employees would no longer support and maintain the

operations of the Debtors, thereby crippling the Debtors' business operations and

instantly destroying the Debtors' ability to maximize the value of the bankruptcy estates

through an orderly sale process.  Further, many of the Debtors' hourly wage Employees

will be severely affected by missing a paycheck, and candidly, forcing these Employees

to be a source of financing of operations is just not fair. The businesses of the Debtors

require the workforce and are dependent upon the workers to maintain their work schedules through the critical early months of the Cases. Consequently, I strongly believe that it is critical that the Debtors be authorized to pay their Employees their pre-petition wages, honor personal time off obligations, continue their workers' compensation and unemployment programs, maintain the standard Employee benefits, continue garnishment and payroll deductions, reimburse Employee's business expenses, and honor the miscellaneous Employee benefits that the Debtors have traditionally provided in the ordinary course of business (all such obligations to the Employees, collectively, the "***Employee Obligations***").

42.     **Authority to Maintain Existing Bank Accounts and Cash Management System**. Prior to the Petition Date, the Debtors implemented and utilized a cash management system and maintained certain accounts. The Office of the United States Trustee's debtor-in-possession guidelines would require the Debtors to, among other things: (a) close all existing bank accounts and to open new debtor-in possession accounts at approved depository banks; and, (b) obtain checks for such debtor-in-possession accounts which bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. I believe that maintaining the pre-petition accounts and the cash management system is in the best interest of the Debtors, the Debtors' employees, the bankruptcy estates and creditors. Because of the size, scope and automated nature of the cash management system, it would be extremely difficult, disruptive, and expensive for the Debtors to close their accounts and open new accounts. The Debtors have and will continue to take certain actions and institute procedures that will prevent the payment of prepetition obligations that are not otherwise approved by the Court. The Debtors have also contacted the United States Trustee prior to filing for protection under the Bankruptcy Code and

explained the cash management system and related matters. The United States Trustee has generally approved the form Order that the Debtors intend to present to the Court. Considering the potential harm the Debtors would suffer should they be forced to comply with the United States Trustee guidelines, I believe it is critical that the Debtors have the authority to maintain their existing bank accounts and cash management system. In addition, I believe the Debtors have taken adequate precautions to avoid paying any prepetition obligations that are not otherwise approved by the Court.

43.     **Utilities Motion**. The Debtors request the entry of interim and final orders pursuant to Sections 105, 363 and 366 of the Bankruptcy Code: (i) prohibiting utility companies from altering, refusing, or discontinuing utility services; (ii) deeming utility companies adequately assured of future performance; (iii) establishing procedures for determining adequate assurance of payment; and, (iv) permitting the utility companies to opt out of the procedures established therein (the "*Utilities Motion*").

(a)     In the ordinary course of business, the Debtors incur expenses for gas, water, sewer, electric, telecommunications, and other similar utility services provided by various utility providers. Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their ability to maximize the value of the bankruptcy estates and for the Debtors to continue to address their environmental obligations. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' value maximizing efforts and, ultimately, creditor recoveries. It is critical that utility services continue uninterrupted during these Cases.

(b)     I believe and am advised that the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance are necessary in these Cases, because if such procedures were not approved, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these Cases. Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding - on or after the thirtieth (30th) day following the Petition Date - that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service could shut down operations, and any significant disruption of operations could jeopardize the Debtors' ability to maximize the value of the bankruptcy estates and to address the Debtors' environmental issues. The Debtors propose to leave prepetition deposits in place and to continue paying the bills of utilities in the ordinary course of business. While this will mean that certain prepetition bills for utilities will be paid, the alternative is that utilities will apply deposits to prepetition amounts leaving the Debtors in the position of having to make new deposits. The effect, money wise, will be the same, but the alternative to the proposal of the Debtors would be very disruptive.

(c)     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors, their creditors, the bankruptcy estates, and all other parties in interest, will enable the Debtors to continue to operate their businesses in chapter 11 without disruption, and will provide the Debtors' numerous providers with assurance that their payments will not be interrupted and that no precipitous action need to be taken.

Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

44.     **Authority to Pay Post-Petition Installments on Insurance Policies Necessary to Maintain Insurance Coverage**.   The Debtors, in the ordinary course of business, maintain various types of insurance.   The types of insurance policies held by the Debtors (the "***Policies***") include coverage for property, automobile, commercial general liability, umbrella, and workers compensation.   All of these policies are essential to the preservation of the Debtors, their businesses, properties and the bankruptcy estates.   I believe it is essential for the Debtors to be given the authority to pay the post-petition payments on the Policies in the ordinary course of business to maintain insurance coverage that is currently in effect or to secure new, replacement insurance coverage.   I believe and upon advice that due to the importance of maintaining continued insurance coverage with respect to all of their business activities and preservation of the Debtors' assets and the bankruptcy estates, the authority to continue in effect the policies is in the best interest of the bankruptcy estates and all interested parties; and further, is absolutely essential to the Debtor's ability to maximize the value of the bankruptcy estates and in order to continue to address their environmental obligations.

45.     **Expedited Hearings on Certain First Day Motions and Applications**.   The relief requested in each of the First Day Motions is necessary to avoid immediate and irreparable harm to the Debtors' businesses and to the bankruptcy estates.   It is also essential to the continued operation of the Debtors' businesses that the Debtors satisfy or maintain their current obligations, that they continue their operations without interruption and that the Debtors continue to address their environmental issues.   Therefore, I believe this Court should address the First

Day Motions and Applications on an expedited basis and as soon as practicable so that adverse

consequences may be avoided and so the Debtors' chapter 11 cases can proceed without delay.

## CONCLUSION

46.    In conclusion, for the reasons stated herein and in each of the First Day Motions

filed concurrently or in connection with the commencement of these Cases, I respectfully request

that each of the First Day Motions be granted in its entirety, together with such other and further

relief as this Court deems just and proper.

I certify under penalty of perjury that based upon my knowledge, information and belief

as set forth in this Declaration, the foregoing is true and correct.

Dated:  October 27, 2014.


                                        *s/ David N. Phelps*
                                        DAVID N. PHELPS



ButlerSnow 23237395v1

| Oct. 27, 2014  Mississippi Phosphates Corp. DIP Budget | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 26-Oct | 2-Nov | 9-Nov | 16-Nov | 23-Nov | 30-Nov | 7-Dec | 14-Dec | 21-Dec | 28-Dec |
| Beginning Cash | $ 789,800 | $ 789,800 | $ 1,421,409 | $ 1,018,052 | $ 1,704,486 | $ 3,477,346 | $ 742,058 | $ 4,027,579 | $ 3,740,496 | $ 3,444,116 |
| | | | | | | | | | | |
| DAP/MAP Provisional Amount | $ - | $ 728,784 | $ 1,680,000 | $ 3,292,800 | $ 3,292,800 | $ 3,214,400 | $ 2,755,200 | $ - | $ - | $ - |
| MAP/DAP true-up on Netback | - | 615,552 | - | 799,578 | 973,989 | 973,989 | 1,062,654 | 483,738 | - | - |
| Terminal Management Fee Ammonia | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total Receipts | $ - | $ 1,344,336 | $ 1,680,000 | $ 4,092,378 | $ 4,266,789 | $ 4,188,389 | $ 3,817,854 | $ 483,738 | $ - | $ - |
| Total Cash Available | $ 789,800 | $ 2,134,136 | $ 3,101,409 | $ 5,110,430 | $ 5,971,275 | $ 7,665,735 | $ 4,559,912 | $ 4,511,316 | $ 3,740,496 | $ 3,444,116 |
| **OPERATIONAL COST DISBURSEMENTS:** | | | | | | | | | | |
| Raw Material Purchased | - | 2,592,827 | 1,821,774 | 1,946,544 | 1,688,145 | - | - | - | - | - |
| Plant Payroll related | - | 823,900 | - | 769,400 | - | 769,400 | 119,500 | 267,320 | 42,880 | 163,000 |
| Accrued Vacation | - | - | - | 100,000 | - | 150,000 | - | 100,000 | - | 75,000 |
| Management Services Agreement | - | - | 35,833 | - | 67,876 | - | 35,833 | - | 84,000 | 35,833 |
| Utilities | - | 344,000 | 710,000 | - | - | 775,000 | - | - | - | 250,000 |
| Company Property and Casualty Insurance | - | - | - | - | 387,158 | - | - | - | - | 387,158 |
| Other Operational  Spending | - | 430,000 | 323,000 | 223,000 | 163,000 | 76,700 | 48,000 | 13,000 | 13,000 | 16,700 |
| Other Administrative Expenses | - | 350,000 | - | - | - | - | - | - | - | - |
| Sub-Total Operational Costs | - | 4,540,727 | 2,890,607 | 3,038,944 | 2,306,179 | 1,771,100 | 203,333 | 380,320 | 139,880 | 927,691 |
| **PREPAID and CAPITAL ADDITION DISBURSEMENTS** | | | | | | | | | | |
| Contingency | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 30,000 | 10,000 | 10,000 |
| Sub- Total Prepaid and Capital Addition Disbursements | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 30,000 | 10,000 | 10,000 |
| **Environmental Spending** | | | | | | | | | | |
| Environmental Management - Allen Engineering | - | 20,000 | - | 20,000 | - | - | 20,000 | - | 20,000 | - |
| Waste Water Treatment Chemicals | - | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 |
| Financial Assurance Trust Payment | - | - | - | - | - | - | - | - | - | 200,000 |
| Sub-Total Environmental Spending | - | 97,000 | 77,000 | 97,000 | 77,000 | 77,000 | 97,000 | 77,000 | 97,000 | 277,000 |
| **Bankruptcy Fees and Expenses** | | | | | | | | | | |
| Debtor Costs - Legal and other Services | - | 25,000 | 60,750 | 197,500 | 60,750 | - | 177,000 | 247,500 | 49,500 | - |
| Creditor Costs | - | - | 5,000 | 22,500 | - | - | 5,000 | 36,000 | - | - |
| US Trustee and Court Costs | - | - | - | - | - | - | - | - | - | - |
| Total Bankruptcy Costs | - | 25,000 | 65,750 | 220,000 | 60,750 | 25,577 | 182,000 | 283,500 | 49,500 | - |
| Cash Consumed | - | 4,712,727 | 3,083,357 | 3,405,944 | 2,493,929 | 1,923,677 | 532,333 | 770,820 | 296,380 | 1,214,691 |
| **DIP Lending Activity** | - | 4,000,000 | 1,000,000 | - | - | (5,000,000) | - | - | - | - |
| Ending Cash | $ 789,800 | $ 1,421,409 | $ 1,018,052 | $ 1,704,486 | $ 3,477,346 | $ 742,058 | $ 4,027,579 | $ 3,740,496 | $ 3,444,116 | $ 2,229,425 |

Note:  The above does not include any potential 503(b)9 claims, if any should exist at the time of filing.

| Oct. 27, 2014 Mississippi Phosphates Corp. DIP Budget Week Ending: | 11 4-Jan | 12 11-Jan | 13 18-Jan | 14 25-Jan | 15 1-Feb | 16 8-Feb | 17 15-Feb | 18 22-Feb | 19 1-Mar | 20 8-Mar | 21 15-Mar |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash $ | 2,229,425 | 1,867,045 | 1,619,045 | 1,166,665 | 1,473,557 | 1,251,977 | 1,007,727 | 594,207 | 951,099 | 732,204 | 1,487,954 |
| DAP/MAP Provisional Amount $ | - | - | - | - | - | - | - | - | - | - | - |
| MAP/DAP true-up on Netback | - | - | - | - | - | - | - | - | - | - | - |
| Terminal Management Fee Ammonia $ | - | - | - | - | - | - | - | - | - | - | - |
| Total Receipts $ | - | - | - | - | - | - | - | - | - | - | - |
| Total Cash Available $ | 2,229,425 | 1,867,045 | 1,619,045 | 1,166,665 | 1,473,557 | 1,251,977 | 1,007,727 | 594,207 | 951,099 | 732,204 | 1,487,954 |
| **OPERATIONAL COST DISBURSEMENTS:** | | | | | | | | | | | |
| Raw Material Purchased | - | - | - | - | - | - | - | - | - | - | - |
| Plant Payroll related | 97,380 | 98,000 | 62,380 | 85,750 | 50,520 | 114,250 | 50,520 | 85,750 | 48,895 | 114,250 | 48,895 |
| Accrued Vacation | - | 50,000 | - | 25,000 | - | - | - | - | - | - | - |
| Management Services Agreement | - | - | - | 21,500 | - | - | - | 21,500 | - | - | - |
| Utilities | - | - | - | 70,000 | - | - | - | 45,000 | - | - | - |
| Company Property and Casualty Insurance | - | - | - | 387,158 | - | - | - | 387,158 | - | - | - |
| Other Operational Spending | 43,000 | 13,000 | 13,000 | 16,700 | 18,000 | 23,000 | 13,000 | 16,700 | 18,000 | 23,000 | 13,000 |
| Other Administrative Expenses | - | - | - | - | 1,060 | - | - | - | - | - | - |
| Sub-Total Operational Costs | 140,380 | 161,000 | 75,380 | 606,108 | 69,580 | 137,250 | 63,520 | 556,108 | 66,895 | 137,250 | 61,895 |
| **PREPAID and CAPITAL ADDITION DISBURSEMENTS** | | | | | | | | | | | |
| Contingency | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Sub- Total Prepaid and Capital Addition Disbursements | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| **Environmental Spending** | | | | | | | | | | | |
| Environmental Management - Allen Engineering | 20,000 | - | 20,000 | - | 20,000 | - | 20,000 | - | 20,000 | - | 20,000 |
| Waste Water Treatment Chemicals | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 | 77,000 |
| Financial Assurance Trust Payment | - | - | - | - | - | - | - | - | - | - | - |
| Sub-Total Environmental Spending | 97,000 | 77,000 | 97,000 | 77,000 | 97,000 | 77,000 | 97,000 | 77,000 | 97,000 | 77,000 | 97,000 |
| **Bankruptcy Fees and Expenses** | | | | | | | | | | | |
| Debtor Costs - Legal and other Services | 110,000 | - | 247,500 | - | 45,000 | 15,000 | 225,000 | - | 45,000 | 15,000 | 225,000 |
| Creditor Costs | 5,000 | - | 22,500 | - | - | 5,000 | 18,000 | - | - | 5,000 | 18,000 |
| US Trustee and Court Costs | - | - | - | - | - | - | - | - | - | - | - |
| Total Bankruptcy Costs | 115,000 | - | 270,000 | - | 45,000 | 20,000 | 243,000 | - | 45,000 | 20,000 | 243,000 |
| Cash Consumed | 362,380 | 248,000 | 452,380 | 693,108 | 221,580 | 244,250 | 413,520 | 643,108 | 218,895 | 244,250 | 411,895 |
| DIP Lending Activity | - | - | - | 1,000,000 | - | - | - | 1,000,000 | - | 1,000,000 | - |
| Ending Cash $ | 1,867,045 | 1,619,045 | 1,166,665 | 1,473,557 | 1,251,977 | 1,007,727 | 594,207 | 951,099 | 732,204 | 1,487,954 | 1,076,059 |

Note: The above does not include any potential 503(b)9 claims, if

| Oct. 27, 2014  Mississippi Phosphates Corp. DIP Budget<br>Week Ending: | | 22<br>22-Mar | | 23<br>29-Mar | | 24<br>5-Apr | | 25<br>12-Apr | | 26<br>19-Apr |
|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | $ | 1,076,059 | $ | 868,810 | $ | 1,019,057 | $ | 801,807 | $ | 1,019,787 |
| | | | | | | | | | | |
| DAP/MAP Provisional Amount | $ | - | $ | - | $ | - | $ | - | $ | - |
| MAP/DAP true-up on Netback | | - | | - | | - | | - | | - |
| Terminal Management Fee Ammonia | $ | - | $ | - | $ | - | $ | - | $ | - |
| | | | | | | | | | | |
| Total Receipts | $ | - | $ | - | $ | - | $ | - | $ | - |
| | | | | | | | | | | |
| Total Cash Available | $ | 1,076,059 | $ | 868,810 | $ | 1,019,057 | $ | 801,807 | $ | 1,019,787 |
| | | | | | | | | | | |
| **OPERATIONAL COST DISBURSEMENTS:** | | | | | | | | | | |
| Raw Material Purchased | | - | | - | | - | | - | | - |
| Plant Payroll related | | 85,750 | | 48,895 | | 106,250 | | 37,520 | | 97,125 |
| Accrued Vacation | | - | | - | | - | | - | | - |
| Management Services Agreement | | 21,500 | | - | | - | | - | | 21,500 |
| Utilities | | - | | 45,000 | | - | | - | | - |
| Company Property and Casualty Insurance | | - | | 387,158 | | - | | - | | - |
| Other Operational Spending | | 13,000 | | 16,700 | | 19,000 | | 13,000 | | 13,000 |
| Other Administrative Expenses | | - | | - | | - | | - | | - |
| Sub-Total Operational Costs | | 120,250 | | 497,753 | | 125,250 | | 50,520 | | 131,625 |
| | | | | | | | | | | |
| **PREPAID and CAPITAL ADDITION DISBURSEMENTS** | | | | | | | | | | |
| Contingency | | 10,000 | | 10,000 | | 10,000 | | 10,000 | | 10,000 |
| Sub-Total Prepaid and Capital Addition Disbursements | | 10,000 | | 10,000 | | 10,000 | | 10,000 | | 10,000 |
| | | | | | | | | | | |
| **Environmental Spending** | | | | | | | | | | |
| Environmental Management - Allen Engineering | | - | | 20,000 | | - | | 20,000 | | - |
| Waste Water Treatment Chemicals | | 77,000 | | 77,000 | | 77,000 | | 77,000 | | 77,000 |
| Financial Assurance Trust Payment | | - | | 200,000 | | - | | - | | - |
| Sub-Total Environmental Spending | | 77,000 | | 297,000 | | 77,000 | | 97,000 | | 77,000 |
| | | | | | | | | | | |
| **Bankruptcy Fees and Expenses** | | | | | | | | | | |
| Debtor Costs - Legal and other Services | | - | | 45,000 | | - | | 124,500 | | 405,000 |
| Creditor Costs | | - | | - | | 5,000 | | - | | 43,000 |
| US Trustee and Court Costs | | - | | - | | - | | - | | 30,000 |
| Total Bankruptcy Costs | | - | | 45,000 | | 5,000 | | 124,500 | | 517,712 |
| | | | | | | | | | | |
| Cash Consumed | | 207,250 | | 849,753 | | 217,250 | | 282,020 | | 736,336 |
| **DIP Lending Activity** | | - | | 1,000,000 | | - | | 500,000 | | - |
| | | | | | | | | | | |
| Ending Cash | $ | 868,810 | $ | 1,019,057 | $ | 801,807 | $ | 1,019,787 | $ | 283,450 |

Note: The above does not include any potential 503(b)9 claims, if.