IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MISSISSIPPI PHOSPHATES | ) | |
| CORPORATION, *et al.*[1] | ) | CASE NO. 14-51667-KMS |
| | ) | Chapter 11 |
| | ) | |
| | ) | (Joint Administration Requested) |
| **Debtors** | ) | |
| | ) | |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO INCUR POST-PETITION SENIOR SECURED SUPERPRIORITY INDEBTEDNESS; (II) AUTHORIZING USE OF CASH COLLATERAL; (III) GRANTING POST-PETITION PRIMING AND SENIOR PRIORITY SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION; (V) MODIFYING THE AUTOMATIC STAY; AND (VI) SCHEDULING <u>A FINAL HEARING ON THE MOTION</u>**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Mississippi Phosphates Corporation, *et al.*, the Debtors and debtors-in-possession (collectively, the "***Debtors***") in these jointly administered chapter 11 cases, by and through their undersigned attorneys, in the above captioned cases (the "***Chapter 11 Cases***"), hereby file this *Emergency Motion for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 (I) Authorizing the Debtors to Incur Post-Petition Senior Secured Superpriority Indebtedness; (II) Authorizing Use of Cash Collateral; (III) Granting Post-Petition Priming and Senior Priority Security Interests and Superpriority Claims; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Scheduling a Final Hearing on the Motion* (the "***Motion***") and in support of this Motion, the Debtors show as follows:

---

[1] The following affiliated Debtors have requested joint administration herein: Mississippi Phosphates Corporation ("***MPC***"), Ammonia Tank Subsidiary, Inc. ("***ATS***") and Sulfuric Acid Tanks Subsidiary, Inc. ("***SATS***").

- 1 -

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

2. On October 27, 2014 (the "*Petition Date*"), the Debtors filed their voluntary petitions for relief and thereby commenced these bankruptcy cases under chapter 11, title 11 of the United States Code (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Southern District of Mississippi, Southern Division (the "*Court*"). Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their business and managing the properties as debtors-in-possession. No trustees or examiners have been appointed, and no official committees of creditors or equity interest holders have yet been established.

3. MPC is a Delaware corporation with its principal place of business located at 601 Industrial Road, Pascagoula, Mississippi. MPC is a major United States producer and marketer of one of the most common types of phosphate fertilizer, diammonium phosphate ("*DAP*"). MPC's production facilities are located on a deep-water channel in Pascagoula, Mississippi. As of the Petition Date, MPC employed 224 employees and 26 "nested" third-party contract employees. MPC's production facilities currently yield approximately 600,000 to 650,000 tons of DAP annually.

4. ATS is a Delaware corporation with its principal place of business located at 601 Industrial Road, Pascagoula, Mississippi. ATS is a wholly owned subsidiary of MPC formed in May 2010. ATS' facilities include an ammonia tank, which stores ammonia used in MPC's production of DAP.

SATS is a Delaware corporation with its principal place of business located at 601 Industrial Road, Pascagoula, Mississippi. SATS is a wholly owned subsidiary of MPC formed in May 2010. SATS' facilities include a sulfuric acid storage tank, which stores sulfuric acid used in MPC's production of DAP.

5. The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure.

6. Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in that certain *Declaration of David N. Phelps in Support of the Debtor's Chapter 11 Petitions and First Day Motions* (the "**Phelps Declaration**") [Dkt. # 13], which is incorporated herein by reference.

## FACTUAL BACKGROUND

### A. Description of Business

7. MPC is a major United States producer and marketer of DAP, one of the most common types of phosphate fertilizer. DAP is MPC's primary product. To produce DAP, phosphate rock is combined with sulfuric acid to form phosphoric acid, which is then mixed with ammonia to produce DAP, a dry granular product. In its chemical composition, DAP is comprised of 46 percent phosphate and 18 percent nitrogen. Of the ammoniated phosphate produced in the United States, 98 percent is sold as fertilizer. Among other things, phosphate affects seed germination, it helps plants use water efficiently and protects plants against diseases. Thus, DAP plays an important role in improving crop quality, increasing crop yields and mitigating the effects of environmental stresses on plants.

8. As of the Petition Date, the Company employed 224 employees and approximately 26 "nested" third-party contract employees. MPC's production facilities are

located on a deep-water channel in Pascagoula, Mississippi, with direct access to the Gulf of Mexico. The Company's manufacturing facilities consist of two sulfuric acid plants, a phosphoric acid plant and a DAP granulation plant.

9.  In 2013, MPC sold 618,000 tons of DAP at an average price of $394 per ton. For the year ended December 31, 2013, the Company had net sales of $246.5 million, operating loss of $29.6 million, cash flow from operations of ($29.6) million and EBITDA of ($14.8) million. As of September 30, 2014 (year to date), MPC has (a) sold 343,582 tons of DAP at an average price of $416 per ton, (b) sold 23,295 tons of monoammonium phosphate ("*MAP*") at an average price of $475 per ton, and (c) had miscellaneous terminaling revenue of approximately $1.4 million. Also, as of September 30, 2014 (year to date), the Company has net sales of $155.6 million, pre-tax operating loss of $33.9 million, cash used in operations of ($22.9) million and EBITDA of ($15.4) million.

10. During the course of these Chapter 11 Cases, the Debtors intend to intend to operate in in the ordinary course of business, including the manufacture and sale of DAP using its entire inventory of phosphate rock for that purpose.

B.  **Description of Debt**

11. Before the Petition Date, each of the Debtors entered into that certain Amended and Restated Credit Agreement, dated as of September 4, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "*Pre-Petition Credit Agreement*"), among the Debtors, as borrowers, and Phosphate Holdings, Inc. as guarantor (the "*Guarantor*"),[2] the lenders from time to time party thereto (the "*Pre-Petition Lenders*") and STUW LLC, as administrative agent (the "*Agent*") for the Pre-Petition Lenders, pursuant to

---

[2] The Guarantor is the Debtors' ultimate corporate parent.

- 4 -

which, the Pre-Petition Lenders extended credit and loaned money to the Debtors on the terms set forth therein.

12. As of the Petition Date, over $58 million in principal and interest obligations were outstanding under the Credit Agreement. The obligations under the Credit Agreement are secured by a first-priority, senior lien and security interest on certain real and personal property assets of each of the Debtors and the Guarantor pursuant to the Amended and Restated Pledge and Security Agreement, dated September 4, 2013 and related deeds of trust, lien filings, pledge agreements and other security instruments (each, as amended, restated, supplemented or otherwise modified from time to time), by the Debtors and the Guarantor, as grantors, in favor of Agent for the ratable benefit of the Pre-Petition Lenders.

**RELIEF REQUESTED**

13. By this Motion, the Debtors request entry of interim and final orders (the "***DIP Orders***") authorizing them to borrow money from certain Pre-Petition Lenders (the "***DIP Lenders***")[3] under a revolving credit facility (the "***DIP Financing***") in accordance with the Term Sheet attached hereto as **Exhibit A**[4] embodying the terms of DIP Financing (the "***DIP Facility***") and the DIP Orders. The following are the salient terms of the proposed DIP Financing and the proposed order granting this Motion on an interim basis (the "***Interim DIP Order***"):[5]

    a. The Debtors obtain from the DIP Lenders loans and credit advances (the "***Loan Advances***") in an aggregate principal sum of (i) up to $5,000,000 upon entry of the Interim DIP Order and (ii) following the entry of the final order approving the Motion (the "***Final DIP Order***"), up to a total sum of $5,000,000 plus accrued interest on the aggregate principal amount and fees and expenses on a revolving basis, to be used

---

[3] A schedule of the DIP Lenders is attached to the Term Sheet.

[4] To the extent required by the DIP Lenders, a definitive credit agreement governing the DIP Facility that incorporates the terms and conditions set forth in the Term Sheet, and is otherwise in form and substance acceptable to the DIP Lenders, will be prepared and executed by the parties.

[5] All otherwise undefined terms have the meanings set forth in the Interim DIP Order. A copy of the Interim DIP Order is attached hereto as **Exhibit B**.

exclusively to (W) fund working capital, required and approved capital expenses and general corporate purposes relating to post-petition operations, including the production and sale of DAP in the ordinary course of business and maintenance of water treatment costs of the east gypsum disposal facility and treatment for water and leachate, as well as expenses related to a sales process for the Debtors' assets,[6] and (X) pay, up to the budgeted amount for the fees, costs, expenses, and disbursements of professionals retained by the Debtors and the Committee, each as approved by the Court, and bankruptcy related charges limited by the amounts set forth in the budget approved by the Lenders (the "***Approved Budget***")[7] including United States Trustee and Clerk Fees Such Loan Advances will be subject to the timing and details of, and to be used in accordance with, the Approved Budget.

      b.    That the obligations of the Debtors under the DIP Facility (i) be secured by a first-priority priming lien on any and all assets of the Debtors that secure the obligations under the Pre-Petition Credit Agreement pursuant to section 364(d) subject to the Carve Out (defined below) and amounts required to be paid by Debtors to the United States Trustee during the respective terms of the DIP Orders, (ii) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to exclusive superpriority administrative expense status in the Chapter 11 Cases, (iii) pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a first-priority perfected security interest in all of Debtors' and the Guarantor's unencumbered assets, including all real and personal property, whether now owned or hereafter acquired, including the proceeds of Avoidance Actions, and (iv) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on any specific property of Debtors and the Guarantor that is subject to valid, perfected and non-avoidable liens (other than liens arising under the Pre-Petition Credit Agreement).

      c.    The Interim DIP Order provides for the Debtors to stipulate to the liens and claims of the Pre-Petition Lenders and a sixty (60) day period for parties-in-interest to challenge the Debtors' stipulations. If no challenge is filed, the Debtors' stipulations will be binding on the bankruptcy estates. Additionally, upon entry of the Final DIP Order, any right or claim that could be asserted by any party in interest in the case to surcharge the DIP Lenders or their collateral under section 506(c) of the Bankruptcy Code, or otherwise, shall be waived by the Debtors for the estates and barred pursuant to the Final DIP Order.

      d.    Under Bankruptcy Rule 4001, an interim hearing (the "***Interim Hearing***") be held before this Court to consider entry of the Interim DIP Order approving the post-petition financing facility on an interim basis and authorizing the Debtors to obtain, on an interim basis, under the DIP Facility, a sum not to exceed $5,000,000 pursuant to the terms and conditions of the Interim DIP Order,[8] and further requesting a setting for a final hearing on this Motion (the "***Final Hearing***") and

---

[6] The Debtors anticipate filing a motion to establish certain sales procedures and to authorize the sale of substantially all of the Debtors' assets.

[7] A copy of the Approved Budget is attached hereto as **Exhibit C.**

[8] To the extent there is a conflict between the Term Sheet and the Interim DIP Order, the Interim DIP Order shall control.

establishing notice procedures for the Final Hearing, wherein the Court will consider entry of the Final DIP Order authorizing the DIP Financing.

  e.  That the Court authorizes the use of the cash collateral of the Pre-Petition Lenders pursuant to the DIP Orders and section 363(c) of the Code and approves the agreed adequate protection for the use of the Pre-Petition Lenders' cash collateral.

## V. AUTHORITIES AND ARGUMENT

A. **Debtor-in-Possession Financing**

  (i) **Senior Lien on Collateral of Pre-Petition Lenders**

14. Section 364(d) of the Bankruptcy Code provides that a debtor may obtain post-petition financing by granting a lien on property of the estate that is senior or equal to liens that already exist on such property, so long as the debtor provides adequate protection of the previous lienholders' interest in such property. Section 364(d) of the Bankruptcy Code provides:

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —
>
>  (A) the trustee is unable to obtain such credit otherwise; and
>
>  (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

15. The Debtors satisfy the requirements of section 364(d) of the Bankruptcy Code because (a) the Debtors are unable to obtain credit otherwise,[9] (b) the Pre-Petition Lenders are adequately protected and consent to a section 364(d) priming lien, and (c) the proposed DIP Financing is in the best interest of the bankruptcy estates. The Debtors seek to grant a senior lien upon the collateral of the Pre-Petition Lenders, subject to the Carve Out (as defined below).

---

[9] As reflected in the Phelps Declaration, David Phelps was retained as the Chief Restructuring Officer for the Debtor. Based on his experience as a CRO and his knowledge of the financial marketplace for DIP Loans, the Debtors would not be able to obtain as favorable terms for a DIP Loan as that offered by the DIP Lenders, especially in the limited time available.

As will be demonstrated below, the Pre-Petition Lenders will be provided additional adequate protection during both the interim period and the entirety of the Chapter 11 Cases.

16. In the Debtors' business judgment, the DIP Facility represents the best financing option to effectuate these purposes and advance the Debtors' reorganization efforts. The terms of the DIP Facility neither (a) tilt the conduct of the Chapter 11 Cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties-in-interest from being decided on their merits.

17. The superpriority claims and Liens granted to the DIP Lenders or the DIP Agent under the DIP Orders shall be subject to the Carve-Out for (a) the unpaid fees of the Clerk of the Court and the United States Trustee; (b) the fees and expenses incurred by any Chapter 7 trustee and any professionals retained by such trustee, in an aggregate amount not to exceed $50,000; (c) to the extent provided in the Approved Budget and allowed by final order (which cannot exceed such budgeted amounts), all unpaid fees and expenses of Chapter 11 professionals retained by the Debtors or the Committee, which are incurred at any time on or before the first business day following a Termination Event, whether allowed by the Court prior to or after the Termination Event; and (d) after the first business day following a Termination Event, to the extent allowed by a final order, the payment of reasonable fees of such Chapter 11 professionals referenced in clause (c) above, *pro rata*, in an aggregate amount not to exceed $200,000 (the "***Carve Out***").

18. The Carve Out is fair, reasonable, and appropriate. In this regard, the Carve Out will ensure that the Debtors and the Committee are able to obtain the assistance of counsel, thereby promoting the collective rights and expectations of parties-in-interest.

19. Likewise, the various fees and charges required under the DIP Facility are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar

Document  Page 9 of 17

lender incentives that extend beyond the specific liens and rights specified in section 364 of the Bankruptcy Code.

### (ii) Additional Liens on Unencumbered Assets or Second Liens

20. Pursuant to section 364(c) of the Bankruptcy Code, a debtor may also, in the exercise of its business judgment, incur secured debts on the unencumbered assets of the debtor or junior liens on encumbered assets, if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates. Section 364(c) of the Bankruptcy Code provides:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

21. The Debtors have been unable to procure the required funds in the form of unsecured credit with an administrative priority. Accordingly, under the circumstances, the Debtors should be authorized to enter into a secured financing arrangement under section 364(c) of the Bankruptcy Code.

22. Having determined that financing was available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility at arm's-length and pursuant to their business judgment, which is to be accorded great weight so long as it does not run afoul of the provision of and policies underlying the Bankruptcy Code. *See, e.g., Bray v. Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986)(approving debtor-in-possession financing necessary to sustain seasonal business); *In re*

*Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.").

23.   In satisfying the standards of section 364(c) and (d) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require [d]ebtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the debtors' approach of only four lenders was sufficient under such circumstances.

24.   The DIP Financing is clearly for the benefit of the Debtors' bankruptcy estates and creditors. The DIP Financing is critical to maintaining the Debtors' operations and ensuring compliance with the Debtors' environmental obligations[10] and, thus, preserving and enhancing the Debtors' going concern value. As evidenced by the Approved Budget, use of cash collateral alone is insufficient to pay even the normal operating expenses. With the additional liquidity

---

[10] As described in Section VI of the Phelps Declaration, the Debtors' production facility is subject to extensive state and federal environmental, health and safety statutes and regulations. Specifically, the Mississippi Department of Environmental Quality permit to operate the East gypsum disposal facility is conditioned upon the requirement that the Debtors provide financial assurance for payment of the closure, post-closure care and related water treatment costs of the East gypsum disposal facility and also upon treatment for water and leachate as a part of the ongoing operations.

provided by the DIP Financing, the Debtors will be able to obtain goods and services in connection with maintaining ongoing operations on normal credit terms, thereby permitting them to generate revenues, pay their employees, and operate their businesses for the benefit of all parties-in-interest while pursuing an orderly sale process.

25. The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's-length. Accordingly, the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Facility.

**B.     The Court Should Authorize the Use of Cash Collateral**

26. In addition to the need for debtor-in-possession financing, the Debtors' other pressing concern is the need for use of cash collateral of the Pre-Petition Lenders. The Debtors require use of the cash collateral to be able to satisfy payroll and employee benefits, pay severance taxes, and pay vendors to ensure a continued supply of services and materials essential to the Debtors' continued viability. If unable to use the cash collateral, the Debtors would be unable to operate their business.

27. Section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell, or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, each of the Pre-Petition Lenders has consented to the use of cash collateral under the terms of the proposed Interim DIP Order.

28. Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to use cash collateral in accordance with the terms set forth in the Interim DIP Order.

C.   **Approval of Adequate Protection**

29.   Under section 361 of the Bankruptcy Code, when adequate protection is required under section 363 of the Bankruptcy Code to protect against any diminution in value of an interest of an entity in property, a debtor may provide additional or replacement liens to the pre-petition secured creditor. 11 U.S.C. § 361(2). The Pre-Petition Lenders have agreed to the Debtors' use of cash collateral in exchange for a superpriority claim, junior to the superpriority claim of the DIP Lenders (to the extent of a diminution in the value of their collateral) and the other terms of the Interim DIP Order.

30.   As a further condition to the Pre-Petition Lenders' agreement to the Debtors' use of cash collateral and, in certain of their capacities as DIP Lenders, to make the DIP Advances, the Pre-Petition Lenders have required, and the Debtors have agreed to the stipulate to the validity, enforceability, priority and extent of the Pre-Petition Lenders' pre-petition claims and liens and the absences of any defenses or affirmative claims that would otherwise reduce the enforceability or amount of the Pre-Petition Indebtedness. *See* Interim DIP Order, at 11. Pursuant to the DIP Facility and the Interim Order, the Committee, or any other party-in-interest to these Chapter 11 Cases predetermined by the Court to have standing to do so, shall have sixty (60) days from the entry of the Interim DIP Order (or such later date established by the Court or agreed to by the Pre-Petition Lenders, the "***Challenge Period***") to investigate and file an adversary proceeding or contested matter (a) challenging or objecting to the validity, perfection, enforceability, or priority of the Agent's and Pre-Petition Lenders' security interests in and liens on the Pre-Petition Collateral or the amount and allowance of the Pre-Petition Indebtedness, or (b) otherwise asserting any claims or causes of action against the Agent or Pre-Petition Lenders (any action under (a) or (b), a "***Challenge***"). If no such Challenge is timely filed by the end of

the Challenge Period, the Debtors' stipulations shall be binding and the Pre-Petition Lenders' claims, liens and security interests shall be deemed allowed as provided in the DIP Orders.

31. Based on the reservation of rights in favor of the Committee, and all other parties-in-interest that are predetermined to have standing to investigate and pursue a Challenge pursuant to paragraph 21 of the Interim DIP Order, the requirement of the Debtors' stipulations is fair and reasonable and should be approved.

E. **Approval of Modification of the Automatic Stay**

32. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The DIP Facility contemplates that the DIP Lenders shall have a first-priority lien on the Pre-Petition Collateral and on the unencumbered assets of the Debtors and the Interim Order provides for the exercise of remedies upon an Event of Default. To the extent necessary, the DIP Lenders should be granted relief from the automatic stay to perfect such interests and the Court should modify the automatic stay to permit the DIP Lenders to exercise remedies upon an Event of Default.

33. Stay modification provisions of this kind are ordinary and standard features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim DIP Order.

F. **The Interim Approval Should Be Granted**

34. Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 may not be commenced earlier than 15 days after service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited

hearing on the motion and authorize obtaining credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

35. On an interim basis, the Debtors request that this Court authorize the Debtors to borrow and use up to $5,000,000. The Debtors must have the interim relief requested in order to operate their businesses, including, the production and sale of DAP in the ordinary course of business. Absent the interim relief, the Debtors will be unable to meet their payroll obligations and operations will cease. The Debtors have inadequate cash collateral to operate and pay necessary expenses of the Chapter 11 Cases and to move forward with a sale process absent the proposed DIP Financing being approved on an interim emergency basis. As a result, the Debtors need the interim DIP Financing to avoid immediate and irreparable harm to the Debtors' bankruptcy estates. Absent the interim DIP Financing, the Debtors' businesses will simply shut down, the Debtors will be unable to comply with their environmental obligations and their 224 employees and approximately 26 "nested third party contract employees will have to be terminated.

36. The Debtors request, pursuant to Bankruptcy Rule 4001(c), that the Court authorize the Debtors, from and after the entry of the Interim DIP Order, until an order is entered following the Final Hearing on the Motion, to obtain credit under the DIP Facility. This will enable the Debtors to maintain ongoing operations and the means by which they may avoid immediate and irreparable harm and prejudice to their bankruptcy estates and all parties-in-interest, pending the Final Hearing.

## VI.  NOTICE

**A.  Notice With Respect to Interim Hearing on the Motion**

37. Notice of this Motion has been given by facsimile, electronic mail and/or overnight delivery to the following parties, or in lieu thereof, to their counsel: (a) the DIP

Lenders' Agent and its counsel; (b) the United States Trustee; (c) the holders of the twenty (20) largest unsecured claims against the Debtors; (d) certain governmental entities, counsel and parties-in-interest; and (e) the Agent and its counsel. The Debtors submit that, under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

**B.      Notice with Respect to Final Hearing on the Motion**

38.     The Debtors respectfully request that the Court set a final hearing date on the Motion for November 17, 2014 and authorize the Debtors to serve a copy of this Motion and the Interim DIP Order which fixes the time and date for filing objections to this Motion, by first class mail upon (a) counsel to the Committee (if a Committee has been appointed and counsel for the Committee has been selected); (b) the United States Trustee; (c) all parties who have filed requests for notice under Bankruptcy Rule 2002; (d) the holders of the twenty (20) largest unsecured claims against the Debtors; (e) the Agent for the DIP Lenders and its counsel; (f) the Agent and its counsel; (g) all parties who have asserted liens on assets of the Debtors; and (viii) all other parties ordered by the Court. The Debtors request that the Court deem such notice of the final hearing to be sufficient notice under Bankruptcy Rule 4001.

## VII.  PRAYER

WHEREFORE, the Debtors respectfully request that the Court enter the Interim DIP Order (a) authorizing, on an interim basis, the Debtors' to borrow up to $5,000,000 under the DIP Facility from the DIP Lenders on a superpriority secured and administrative claim basis and to use the Pre-Petition and DIP Lenders' cash collateral pursuant to sections 363 and 364 of the Bankruptcy Code; (b) scheduling the Final Hearing on this Motion for approval of the DIP Facility; (c) authorizing, on a final basis, the Debtors' to borrow up to $5,000,000 or additional amounts that may be authorized by the DIP Lenders not to exceed $5,000,000 under the DIP

Facility from the DIP Lenders; and (d) for such other and further relief to which the Debtors may be justly entitled.

THIS, the 27th day of October, 2014.

> By: s/ Stephen W. Rosenblatt
> Stephen W. Rosenblatt (MB # 5676)
> Christopher R. Maddux (MB # 100501)
> J. Mitchell Carrington (MB # 104228)
> Thomas M. Hewitt (MB # 104589)
> BUTLER SNOW LLP
> 1020 Highland Colony Parkway, Suite 1400
> Ridgeland, MS 39157
> Telephone: (601) 985-4504
> Fax: (601) 985-4500
> Steve.Rosenblatt@butlersnow.com
> Chris.Maddux@butlersnow.com
> Mitch.Carrington@butlersnow.com
> Thomas.Hewitt@butlersnow.com
>
> ATTORNEYS FOR THE DEBTORS

ButlerSnow 23234447v2

## CERTIFICATE OF SERVICE

I certify that the foregoing pleading was filed electronically through the Court's ECF system and served electronically on all parties enlisted to receive service electronically and was separately served by e-mail on the following:

David N. Usry, Esq.
Assistant United States Attorney
501 East Court Street
Suite 4-430
Jackson, MS 39201
David.Usry@usdoj.gov

Office of the United States Trustee
501 East Court Street
Suite 6-430
Jackson, MS 39201
USTPRegion05.AB.ECF@usdoj.gov

Christopher J. Steiskal, Sr., Esq.
Office of the United States Trustee
501 East Court Street
Suite 6-430
Jackson, MS 39201
Christopher.J.Steiskal@usdoj.gov

The 20 Largest Unsecured Creditors identified on the attached Exhibit "D" hereto.

SO CERTIFIED, this the 27th day of October 2014.

/s/ Stephen W. Rosenblatt
STEPHEN W. ROSENBLATT