**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **IN THE MATTER OF:** | **Case No. 14-51667-KMS** |
| **MISSISSIPPI PHOSPHATES CORPORATION, et al.** | |
| **Debtors** | |

**RESPONSE AND OBJECTIONS OF MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY TO DEBTORS' EMERGENCY MOTION FOR INTERIM ORDER AND PROPOSED FINAL ORDER PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO INCUR POST-PETITION SENIOR SECURED SUPERPRIORITY INDEBTEDNESS; (II) AUTHORIZING USE OF CASH COLLATERAL; (III) GRANTING POST-PETITION PRIMING AND SENIOR PRIORITY SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION; (V) MODIFYING THE AUTOMATIC STAY; AND (VI) SCHEDULING A FINAL HEARING ON THE MOTION**
<u>**(Relates to Docket Nos. 14, 66 and 143)**</u>

COMES NOW, the Mississippi Department of Environmental Quality ("MDEQ"), on behalf of the Mississippi Commission on Environmental Quality ("Commission"), and files this Response and Objection to the Interim Order (Doc. 66) issued pursuant to Debtors' Motion (Doc. 14), and Debtors' Proposed Final Order (Doc. 143), stating as follows:

**I. INTRODUCTION**

1.      The Mississippi Commission on Environmental Quality ("Commission"), a seven-member body appointed by the Governor, is authorized to develop, implement, and enforce environmental policy in Mississippi.  Miss. Code Ann. §§ 49-2-5 (Rev. 2012), 49-17-17 (Rev. 2012).  The Commission adopts air and water control regulations, including air and water pollution control permit requirements, conducts enforcement of permit and regulatory violations, and oversees the functions of its staff, the Mississippi Department of Environmental Quality

("MDEQ").  The regulations adopted by the Commission set the requirements that must be met

by applicants in order to obtain any number of different permits from a separate body, the

Mississippi Environmental Quality Permit Board ("Permit Board").  The Mississippi Supreme

Court has explained the relationship between the Commission, the Permit Board, and MDEQ in

this way:

> The Mississippi Department of Environmental Quality ("MDEQ")
> serves as the staff for both the Commission on Environmental Quality
> ("Commission") and the Permit Board, providing technical, legal and
> administrative support.
>
> The Commission is a seven-member body appointed by the Governor
> to develop, implement and enforce environmental policy in Mississippi.
> The Commission promulgates environmental regulations that set the
> requirements to be met by applicants in order to obtain a permit from
> the Permit Board.
>
> The Permit Board has more limited and specific authority than the
> Commission.   The Permit Board is the exclusive administrative body
> which issues or denies permits affecting air pollution and water
> pollution control under the State's solid waste disposal laws.
> Generally, the Permit Board cannot institute permit conditions apart
> from those based on a regulation adopted by the Commission.

*Golden Triangle Reg. Solid Waste Mgt. Auth. v. Concerned Citizens Against the Location of the*

*Landfill*, 722 So.2d 648, 650 (Miss. 1998).  The United States Environmental Protection Agency

("EPA") is the federal environmental agency with oversight and Resource Conservation and

Recovery Act ("RCRA") lead authority over the Mississippi Phosphates facility, pursuant to

section 3008(a) and (g) of 42 U.S.C. § 692(a) and (g).

2.      Debtor Mississippi Phosphate Corporation ("MPC" or "Debtor") holds State of

Mississippi Air Pollution Control Title V Construction and Operating Permit 1280-00044. This

permit authorizes, and imposes conditions and limitations upon the air emissions from various

processes engaged in the manufacture of Diammonium Phosphate ("DAP") Fertilizer, including

Rock (Ore) Crushing, Sulfuric Acid Production, Phosphoric Acid Production, and Fertilizer

Production.  See Affidavit of Richard J. Sumrall, which is attached as Exhibit "A" and provides

support to paragraphs 2 through 11 herein.

3.      Debtor holds State of Mississippi Water Pollution Control (NPDES) Permit

MS0003115. This is a National Pollutant Discharge Elimination System (NPDES) permit that

authorizes and imposes conditions, requirements, and limitations upon the discharge of

wastewater from various sources including non-contact cooling water and contaminated

stormwater runoff. Debtor also holds stormwater construction general permit coverage No.

MSR105930 for the Phase II Gypsum storage area.

4.      Debtor holds State of Mississippi Hazardous Waste Management Regulations

Generator ID MSD077909133. Debtor is classified as a Large Quantity Generator of hazardous

waste.

5.      Debtor holds State of Mississippi Solid Waste Management Permit

SW0300040452. This permit authorizes and imposes conditions, requirements, and limitations

upon the disposal of solid wastes (phosphogypsum) into a 263 acre onsite landfill. The East

Phosphogypsum Stack is currently in operation. Financial Assurance for closure and post closure

is required by Debtor's Solid Waste Management Permit and Commission Agreed Order No.

4716-04. A copy of Commission Agreed Order No. 4716-04 is included at Exhibit 1 to the

Affidavit of Richard J. Sumrall.  Debtor maintains financial assurance in the form of a trust fund

at Regions Bank to assure closure and /or post-closure care of the landfill at its facility in

Pascagoula, Mississippi. The sole beneficiary of the trust fund is MDEQ, and its purpose to

assure payment for the costs of closure and/or post-closure care of the facilities covered by the

Trust Agreement in the event that the Debtor fails to do so, whether as a result of bankruptcy or

for any other reason. Debtor's current estimate for the costs associated with closure and post-

closure at the facility is approximately $80,000,000, and the actual costs could potentially exceed

this amount.  To fund the Trust, Debtor has been making quarterly payments of $200,000 into

the fund since 2002.  As of the end of September 2014, the Trust Fund value stood at

approximately $10,900,000.

6.      Debtor is employed in the bulk manufacture of Diammonium Phosphate (DAP)

fertilizer. The facility is located on a deep-water port in Bayou Cassotte. Phosphorous containing

ore (rock) is off loaded from barges onto the site.  The rock is first ground to a fine powder and

reacted with sulfuric acid to produce phosphoric acid. The phosphoric acid is then reacted with

ammonia to produce the DAP fertilizer. The fertilizer is pelletized and shipped in bulk.

Sulfuric acid utilized in the phosphoric acid plant is primarily produced onsite in one of two

sulfuric acid plants. Elemental sulfur is piped to the facility, burned with oxygen and converted

by catalyst into sulfuric acid. Air emissions from sulfuric acid production include sulfur dioxide

and sulfuric acid mist. Sulfur dioxide is regulated as a criteria pollutant under 40 CFR Part 60

Subpart H, 11 Miss. Admin. Code Part 2, Chapter 6, and the facility's Title V Air Permit.

Sulfuric acid mist is regulated for opacity. After significant issues with excess emissions from

both sulfuric acid plants, MDEQ and MPC executed Commission Agreed Order No. 6350 13

imposing operational constraints upon each sulfuric acid plant. A copy of Commission Agreed

Order No. 6350 13 is included at Exhibit 2 to the Affidavit of Richard J. Sumrall.  Further, a

history of acid spills and leaks from the plants has led to significant groundwater contamination

in and around the sulfuric acid plants. Groundwater assessment and remediation is being directed

under an EPA 7003 (Imminent and Substantial Endangerment) Order issued in 2009, and should

continue.

7.      Debtor holds State of Mississippi Water Quality (Clean Water Act Section 401)

Certification Nos. WQC-1989046, WQC-1998122, and WQC-2007115, all of which regulate the

dredging and managing of dredge spoils from debtor's turning basin in Bayou Cassotte. Debtor

also holds State of Mississippi Water Quality (Clean Water Act Section 401) Certification No.

WQC-1996112 for construction of the gypsum storage facility, which required Debtor to set

aside 623 acres of wetlands in a conservation easement as wetlands mitigation. This 623 acre

mitigation area of wetlands is located to the east and northeast of the debtor's facility, in the

vicinity of Bangs Lake.

## II. BACKGROUND

8.     The production of phosphoric acid generates two waste streams of great

environmental significance. First, the material left after the phosphorous has been removed from

the ore contains many heavy metals and must be disposed of in an on site landfill. Furthermore,

any precipitation which falls and contacts this material must be captured and managed onsite.

Regulations prohibit discharge of treated wastewater except under certain catastrophic or chronic

rainfall events. Second, wastewater generated from phosphoric acid production has a very low

pH and high concentrations of phosphorous, ammonia and flourides. This wastewater is also

prohibited from discharge and is managed onsite with contaminated stormwater runoff.  In 2005,

a levee within the stack system failed after receiving heavy rains over the previous two weeks.

The spill resulted in thousands of fish and shellfish killed in Bayou Cassotte and Bangs Lake.

Other releases from the facility have occurred during hurricanes and tropical storms in 2012 and

2013 also resulting in smaller fish kills. Today, with the existing acreage of the landfill, an inch

of rain produces 11.5 million gallons of wastewater. This waste water is reduced only by

evaporation, consumption in the process, or by wastewater treatment (maximum 1.5 million

gallons per day).

9.   Debtor also maintains the closed West Gypsum Stack. This stack ceased receiving

phosphogypsum in 2002 and closure was completed in 2005. A seep of leachate outside the

confining perimeter dike of the closed West Stack was discovered in 2011, and an amendment in

2012 to the EPA 7003 Order required assessment of the area affected by the seepage. The

assessment and remediation required by the EPA 7003 Order should be fully implemented to

address concerns related to seepage from the West Stack.

10. There are both short term and long term significant environmental concerns associated

with the MPC facility.  In the short term (next six months), the Wastewater Treatment Plant

needs to continue to operate and the stacks need to be maintained.  Maintenance of the East stack

includes continued levee stabilization, inspection, and management of the millions of gallons of

contaminated wastewater between the ponds within the levee/stack.  The ponds are currently at a

high level due to recent rainfall events, and the Wastewater treatment is required to reduce the

amount, because additional rainfall events could result in a catastrophic release.  If the plant

stops processing rock, as is anticipated in the coming weeks, then no rainwater would be

consumed by production and it would all collect in the ponds, which will make wastewater

processing all the more critical to reduce this greater quantity of wastewater. Maintenance of the

closed West Stack includes ensuring the cover remains intact and stable to prevent stormwater

infiltration.  Furthermore, this facility is subject to and must comply with 40 CFR Part 418

effluent guidelines which require facilities to maintain storage capacity for rainfall events. When

this capacity is not available, the regulations prescribe conditions under which contaminated

stormwater must/may be treated and discharged. Current water volumes at the facility are such

that the facility *must* treat and discharge contaminated stormwater.

11. In the long term, it is essential that the debtor bankruptcy estate, MPC, and/or its

successor in interest, and/or a purchaser of the assets of MPC through any sale properly close the

East Stack waste landfill, meet post closure requirements including the continued operation of

the Wastewater Treatment system, continue post closure maintenance of the West Stack,

including treatment of any leachate/seepage, and remediate the contaminated groundwater to

acceptable standards.  By MPC's own estimates, the costs associated with closure and post-

closure are in the range of $80,000,000. The Trust Fund assuring the payment of these costs

currently contains only approximately $10,900,000. If MPC or its purchasers are not held

responsible for closure, post-closure, and remediation, then the taxpayers will have to pay the

remainder of these costs, which would be manifestly unjust.  It is also essential that MPC, and/or

its successor in interest, and/or a purchaser of the assets of MPC continue to make the required

contributions to the Trust Fund in the amount of $200,000 each quarter as Debtor has thus far

complied with.  In order to ensure that the taxpayers are not burdened with these costs in the long

term, it is essential that the environmental responsibilities and liabilities associated with MPC's

facility travel with the assets if assets are transferred to a purchaser in the future.

### III. CASELAW RELEVANT TO OBJECTIONS AND PRAYER FOR RELIEF

12. In a Chapter 11 Bankruptcy case involving a contaminated site, where the site had been

taken into receivership by the state of Ohio and remediated, and Ohio sought compensation for

the cleanup costs, the U.S. Supreme Court stated the following: "Finally, we do not question that

anyone in possession of the site-whether it is Kovacs or another in the event the receivership is

liquidated and the trustee abandons the property, or a vendee from the receiver or the bankruptcy

trustee-must comply with the environmental laws of the State of Ohio. Plainly, that person or

firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source

of such conditions."  *Ohio v. Kovacs, dba B & W Enterprises et al*., 105 S.Ct. 705 (1985) at 284.

13. A debtor-in-possession must comply with all federal and state environmental laws

regulating its operations and property. 11 U.S.C. §§ 362(b)(4) (police and regulatory exception

to automatic stay); 28 U.S.C. § 959(b) (debtors-in-possession must manage and operate their

property in accordance with applicable non-bankruptcy law).  In enacting the regulatory

exception, Congress wanted "[t]o combat the risk that the bankruptcy court would become a

sanctuary for environmental wrongdoers."  *United States v. Nicolet, Inc.*, 857 F.2d 202, 207 (3d

Cir. 1988).  "Bankruptcy does not insulate a debtor from environmental regulatory statutes."

*United States v. Hansen*, 262 F.3d 1217, 1238 (11th Cir. 2001); *see also In re Commerce Oil

Co.*, 847 F.2d 291, 297 (6th Cir. 1998) ("[W]e decline to adopt [debtor's] premise that

preservation of the debtor's estate is of greater priority in the statutory scheme set forth by

Congress in Title 11 than is the enforcement of environmental protection laws explicitly intended

to be excepted from the automatic stay.").  The Debtor and its lenders should thus not be

permitted to use bankruptcy as a safe haven from compliance with Debtor's environmental

obligations.  The public should not be exposed to such risks and the bankruptcy system should

not be misused to seek such a result.

14. Financial assurance is an important protection for public health and safety which applies

to debtors and non-debtors alike. *See generally Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274

F.3d 846 (4th Cir. 2001).

## IV. OBJECTIONS

15. MDEQ believes that the budgeted costs for chemicals used to operate the Wastewater

Treatment plant referred to in paragraph 4(a) of the Proposed Final Order are inadequate to

supply chemicals sufficient to run the plant at close to capacity or to treat wastewaters from areas

of the facility other than Pond 6 (which has a lower concentration of hazardous constituents than

other waters at the facility). MDEQ requests the Debtor address costs for chemicals in its budget.

16. As to paragraphs 11 and 21 of the Proposed Final Order, MDEQ cannot take a position

on the validity of the Pre-Petition Indebtedness without first reviewing the Pre-Petition credit

agreement(s). MDEQ has not been provided with a copy of the Pre-petition credit agreement(s).

8

17. Paragraph 27 of the Debtor's Proposed Final Order (previously paragraph 28) incorrectly refers to "statement" and should be replaced with "state".

18. Additional language is needed for Paragraph 33 of the Proposed Final Order stating that any sale is subject to the administrative process related to transfer of the applicable permits, financial assurance, and compliance with environmental laws and regulations.

19. MDEQ, on behalf of the Commission, joins in the United States' objections and incorporates those objections by reference.

**IV. PRAYER FOR RELIEF**

20. WHEREFORE, MDEQ, acting on behalf of the Commission, requests of the Court to include in its Final Order the following relief:

A. Require the debtor to budget such funds and dedicate such resources as may be necessary to continue operation of the Wastewater Treatment Plant, maintenance of the stacks, and compliance with applicable Laws, Regulations, Permits, and Orders issued to its facility in Pascagoula, MS, to protect human health and the environment and to continue to allow state and federal environmental agencies to utilize their police and regulatory powers, pursuant to 11 U.S.C. 362 (b)(4); and

B. Require the debtor to operate its Wastewater Treatment Plant at all such times as the volume of water meets or exceeds the "must treat" standard in accordance with 40 CFR 418; and

C. Require the debtor to dedicate such resources as may be necessary to promptly respond and clean up any releases of pollutants or other environmental violations that may occur at its facility, to protect human health and the environment, pursuant to 11 U.S.C. 362 (b)(4); and

D.  Affirm that the Trust Fund described above is a financial instrument for which MDEQ is the beneficiary, and as such the Trust Fund must not be considered an asset of the Debtors unless and until such time as it may be released by the beneficiary when closure and post-closure activities related to Debtors' facility have been completed; and

E.  Prohibit the aforementioned Trust Fund from being used as collateral on any loans; and

F.  Prohibit the aforementioned Trust Fund from being used to pay the claim of any lender or creditor, whether the claim is Superpriority, Administrative, or otherwise; and

G.  Require that any potential future purchaser of Debtor's facility or assets comply with applicable environmental laws, regulations, permits issued to the facility, and is subject to the administrative process related to transfer of the applicable permits, financial assurance, and compliance with environmental laws and regulations; and

H.  Add the following language to the order:

"Nothing in the Interim or Final Order or the DIP Documents impairs or adversely affects any right of a governmental unit under financial assurance instruments provided by the Debtor to comply with non-bankruptcy law, including the Trust Fund established by Mississippi Phosphates Corporation pursuant to its Solid Waste Management Permit and state regulations".

I.  Paragraphs 37, 38 and 39 of the Proposed Final Order should also be included in the Final Order; and

J.  Any such other relief deemed appropriate by the Court.

RESPECTFULLY SUBMITTED, this the 12th day of November, 2014

By:    */s/ Theodore Lampton*
        Roy Furrh, MSB No. 4321
        Theodore Lampton, MSB No. 101199
        Christopher Wells, MSB No. 99705
        Attorneys for MDEQ and the Commission

Mississippi Department of
Environmental Quality
Legal Division
P.O. Box 2261
Jackson, MS  39225-2261    Email: tlampton@mdeq.ms.gov
Telephone:  601-961-5573        rfurrh@mdeq.ms.gov
Facsimile:  601-961-5349        cwells@mdeq.ms.gov

**<u>CERTIFICATE OF SERVICE</u>**

I certify that the foregoing pleading was filed electronically through the Court's ECF

system and served electronically on all parties enlisted to receive service electronically.

SO CERTIFIED, this the 12th day of November, 2014.


*<u>/s/ Theodore Lampton</u>*
Theodore Lampton