IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| MISSISSIPPI PHOSPHATES ) | |
| CORPORATION, et al.[1] ) | CASE NO. 14-51667-KMS |
| ) | Chapter 11 |
| ) | |
| Debtors ) | Jointly Administered |
| ) | |

**APPLICATION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 105(A) AND 363(B) TO (I) RETAIN DELOITTE TRANSACTIONS AND BUSINESS ANALYTICS LLP TO PROVIDE THE DEBTORS WITH A CHIEF RESTRUCTURING OFFICER, AND (II) DESIGNATE JONATHAN J. NASH AS CHIEF RESTRUCTURING OFFICER FOR THE DEBTORS *NUNC PRO TUNC* TO NOVEMBER 10, 2014**

Mississippi Phosphates Corporation, *et al.*, the Debtors and debtors-in-possession (collectively, the "***Debtors***") in these jointly administered chapter 11 cases, by and through the undersigned attorneys, file this *Application of the Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to (I) Retain Deloitte Transactions and Business Analytics LLP to Provide the Debtors with a Chief Restructuring Officer, and (II) Designate Jonathan J. Nash as Chief Restructuring Officer for the Debtors Nunc Pro Tunc to November 10, 2014* (the "***Application***"), pursuant to the terms and conditions of that certain letter agreement between Deloitte Transactions and Business Analytics LLP ("***DTBA***" or the "***Firm***") and the Debtors, dated effective as of November 10, 2014 (the "***Engagement Letter***"),[2] as the Engagement Letter may be modified by any Order approving

---

[1] The chapter 11 cases of the following affiliated Debtors have been administratively consolidated for joint administration pursuant to that certain *Order Granting Motion of the Debtor for Order Directing Joint Administration of Affiliated Cases Pursuant to Bankruptcy Rule 1015(b)*, dated October 29, 2014 [Dkt. #62]: Mississippi Phosphates Corporation ("***MPC***"), Case No. 14-51667, Ammonia Tank Subsidiary, Inc. ("***ATS***"), Case No. 14-51668 and Sulfuric Acid Tanks Subsidiary, Inc. ("***SATS***"), Case No. 14-51671. These chapter 11 cases are sometimes referred to herein as the "***Bankruptcy Cases***."

[2] A true and correct copy of the Engagement Letter is attached hereto as Exhibit "A" and is incorporated herein by reference. All capitalized terms not otherwise defined herein shall have the meanings given to them in the Engagement Letter. In the event of any inconsistencies between the description of the DTBA engagement described in this Application and the terms of the Engagement Letter, the Engagement Letter shall control.

this Application. In this Application, the Debtors seek to retain DTBA to provide the Debtors with a Chief Restructuring Officer (the "*CRO*") and (b) retain Jonathan J. Nash ("*Nash*") as the CRO for the Debtors *nunc pro tunc* to the November 10, 2014, and in support thereof, the Debtors state as follows:

## JURISDICTION

1.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105(a), 363(b), 1107(a), 1108 and other applicable sections of the United States Bankruptcy Code. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## BACKGROUND

2.  On October 27, 2014 (the "*Petition Date*"), the Debtors filed their voluntary petitions for relief and thereby commenced these bankruptcy cases under chapter 11, title 11 of the United States Code (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Southern District of Mississippi, Southern Division (the "*Court*").

3.  Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their business and managing the properties as debtors-in-possession.

4.  On November 12, 2014, the United States Trustee for the Southern District of Mississippi (the "*United States Trustee*") appointed an Official Committee of Unsecured Creditors (the "*Committee*").

5.  MPC is a Delaware corporation with its principal place of business located at 601 Industrial Road, Pascagoula, Mississippi. MPC is a major United States producer and marketer of one of the most common types of phosphate fertilizer, diammonium phosphate ("*DAP*"). MPC's production facilities are located on a deep-water channel in Pascagoula, Mississippi. As of the

Petition Date, MPC employed 224 employees and 26 "nested" third-party contract employees. MPC's production facilities currently yield approximately 600,000 to 650,000 tons of DAP annually.

6. ATS is a Delaware corporation with its principal place of business located at 601 Industrial Road, Pascagoula, Mississippi. ATS is a wholly owned subsidiary of MPC formed in May 2010. ATS' facilities include an ammonia tank, which stores ammonia used in MPC's production of DAP. ATS does not have any employees; ATS' work is performed by employees of MPC.

7. SATS is a Delaware corporation with its principal place of business located at 601 Industrial Road, Pascagoula, Mississippi. SATS is a wholly owned subsidiary of MPC formed in May 2010. SATS' facilities include a sulfuric acid storage tank, which stores sulfuric acid used in MPC's production of DAP. SATS does not have any employees; SATS' work is performed by employees of MPC.

8. Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in that certain *Declaration of David N. Phelps in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "**Phelps Declaration**") [Dkt. # 13], which is incorporated herein by reference.

## APPLICATION

### I. The Deloitte Transactions and Business Analytics LLP Engagement

9. The Debtors decided that in light of the anticipated wind-down of the DAP production operations and the ramping up of the sales process, they needed a Chief Restructuring Officer who had access to more extensive resources in at least two areas: (a) a global reach into the DAP industry; and (b) storage and terminalling operations. Considering these needs, the Debtors

chose to replace its initial Chief Restructuring Officer and to retain DTBA, with Jonathan J. Nash serving as the duly appointed Chief Restructuring Officer. Nash will be supported by Brandon Smith of DTBA and other DTBA personnel, as required. DTBA, led by personnel of Deloitte's Corporate Restructuring Group service line, will provide to the Debtors through Nash the services required of a Chief Restructuring Officer by these bankruptcy cases.

10. DTBA anticipated beginning its work *nunc pro tunc* the week of November 10, 2014, although the application for retention is being filed this week.

11. The Debtors have requested that Stillwater and Phelps remain in place through Wednesday, November 12, 2014, to assist in the transition of the work from Stillwater and Phelps to DTBA and Nash. Further, the Debtors have requested Phelps to transition his knowledge of the Debtors' business and activities to DTBA even prior to DTBA's Court-approved retention. Both Stillwater and Phelps agreed to and did assist the Debtors in the transition of the role of the CRO from Stillwater and Phelps to DTBA and Nash. The work of Stillwater and Phelps was concluded on or about November 12, 2014.

12. The Debtors are familiar with the professional standing and reputation of DTBA and of Nash, who the Debtors recognize have a wealth of experience and resources to provide consulting services in restructurings and reorganizations and enjoy an excellent national reputation for turnaround services rendered in bankruptcy cases on behalf of debtors and creditors throughout the United States. Nash has substantial experience in providing restructuring and reorganization services both as a Restructuring Principal of DTBA and, previously, as a Managing Partner of CRG Partners. Mr. Nash has extensive international experience and, having lived in China, has managed companies in the Pacific Rim, the Middle East, China, and Europe. With more than 15 years of senior-management experience in a broad mix of companies, he has extensive experience

-4-

providing strategic leadership in crisis situations, solving short-term cash related issues, and implementing financial planning, budgeting, and expense control.

13. Notable bankruptcy or restructuring engagements of Nash include functioning as CRO or CEO for: TMP Directional Marketing (CRO in Ch. 11) and Western Non-Wovens (CEO in Ch. 11.

14. DTBA has advised the Debtors that it will endeavor to coordinate with the other professionals retained by the Debtors in these bankruptcy cases to eliminate unnecessary duplication or overlap of work.

## II. Terms of Engagement

15. Subject to this Court's approval, pursuant to the terms of the Engagement Letter, DTBA agreed to provide the Debtors with a Chief Restructuring Officer, with Nash to serve in that capacity. The CRO, assisted by other personnel of DTBA and its affiliates, is anticipated to provide the following services (the "*Services*"), as requested by the Debtors and agreed to by DTBA:[3]

- Assess Client's current business plan and operations to identify areas of opportunity, including, but not limited to, potential profitability, ongoing cash requirements, profit center contributions and break-even levels;

- Develop Client's financial and operational strategy and associated activities for the Board's input and approval;

- Oversee the implementation of Client's Board-approved financial and operational strategy;

- Coordinate and consult with Client's investment banker with respect to the chapter 11 sales process with respect to potential utilization of Client's assets by potential buyers;

- Oversee the relationship with Client's lenders and other creditors;

---

[3] The summary of the terms of the Engagement Letter set forth in this Application is for convenience only. Except as set forth below, to the extent of any discrepancies between such summary and the terms of the Engagement Letter, the Engagement Letter shall govern.

- Oversee the management of, and effort to enhance, Client's liquidity issues;

- Meet with the Board on a periodic basis to discuss, among other things, engagement progress and financial and operational reports;

- Oversee the implementation of Board-approved bankruptcy efforts of the Client, including being the Client's witness in the bankruptcy court on matters incident to the Client's bankruptcy cases; and

- Perform the day to day functions customarily and reasonably associated with the position of a Chief Restructuring Officer in companies of similar size and complexity.

DTBA also shall provide such other services as may be agreed to by DTBA and Client in writing based on discussions with the Chief Executive Officer of the Debtors as the engagement (the "***Engagement***") progresses and additional information is obtained during the course of the engagement.

16.     Upon approval of its retention, DTBA will report to, and receive direction from, the Chief Executive Officer ("***CEO***") and the Board of Directors of the Debtors. Moreover, Nash will act under the direction, control, and guidance of the CEO and the Board of Directors of the Debtors as long as he remains as the CRO.

### III.     Fees and Expenses

17.     As set forth in the Engagement Letter, the rates DTBA would charge for its Engagement are as follows:

(a)     Fees. DTBA's professional fees for the engagement including the CRO function will be at the rate of $25,000 per week. DTBA's professional fees for other Services, to the extent provided, will be at the rate of $175-$695 an hour, depending on the personnel assigned to the particular tasks. No other Services, however, shall be provided to the Debtors without prior consultation with and approval by the Debtors and a prior

agreement to include such fees in the Approved Budget as referred to in the Engagement Letter and to insure the Debtors' ability to fund such fees.

(b) <u>Expenses</u>. DTBA will be entitled to reimbursement of reasonable expenses incurred in connection with this engagement, including travel, meals and lodging, and delivery services.

(c) <u>Payment</u>. All fees and expenses will be billed to Client weekly and are payable upon receipt, subject to the understanding that DTBA may agree to adjust this requirement to any interim billing and payment protocol upon approval by the Court.

### IV. <u>Indemnification</u>

18. The Debtors shall indemnify and hold harmless Nash, DTBA, its subsidiaries and subcontractors, and their respective personnel, including the CRO (collectively, the "***Indemnified Parties***") from and against any and all pending or threatened claims, demands, suits, investigations, proceedings, judgments, awards, liabilities, losses, damages, fees, and expenses incurred by any of the Indemnified Parties in connection with, arising out of or related to (whether from direct claims or third party claims) the Engagement, as more particularly set forth in the Engagement Letter (the "***Indemnification Agreement***"), except to the extent resulting from the bad faith or intentional misconduct of DTBA or its subcontractors. In addition to the above indemnification, the CRO will receive the benefit of the most favorable indemnification and exculpation provisions provided by the Debtors to their directors, officers and similar employees pursuant to the Debtors' corporate charter and by-laws, by contract, by applicable law or otherwise.

19. The Debtors believe that the indemnity provisions described therein are reasonable terms and conditions of DTBA's engagement. Further, courts generally hold that exculpation and

indemnification clauses are permissible in retention agreements if the clauses are reasonable. Also, because such indemnification clauses do not exclude liability for gross negligence or willful misconduct, but merely restate the standard of care already in effect, they have been held to be unobjectionable, whether in a retention agreement or as a plan provision. *See, e.g., In re United Artists Theatre Co.*, 315 F.3d 217, 230 (3d Cir. 2003); *In re Friedman's, Inc.*, 2005 Bankr. LEXIS 3140 (Bankr. S.D. Ga. Nov. 23, 2005); *In re Enron Corp.*, 326 B.R. 497 (S.D.N.Y. 2005); *In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000); *In re Firstline Corp.*, 2007 Bankr. LEXIS 286 (Bankr. M.D. Ga. Jan. 25, 2007).

20. These indemnity and expense reimbursement obligations: (i) will be in addition to any liability the Debtors may have to DTBA at common law or otherwise; (ii) will survive the expiration of DTBA's Engagement and the termination of these chapter 11 cases or any cases into which they may be converted; (iii) will apply to any modification of DTBA's Engagement and would remain in full force and effect following the completion or termination of the Engagement as amended or modified; and (iv) will be binding on any successor or assign of the Debtors.

21. The Debtors believe that the indemnity provisions described herein are reasonable terms and conditions of DTBA's Engagement and were, along with all terms of the Engagement Letter, negotiated by the Debtors and DTBA at arm's-length and in good faith. DTBA and the Debtors believe that the indemnity provision is comparable to those indemnification provisions generally obtained by restructuring management firms of similar stature to DTBA and for comparable engagements, both in court and out of court. The Debtors respectfully submit that the indemnification provisions contained in the Indemnification Agreement, viewed in conjunction with the other terms of DTBA's proposed retention, are reasonable and in the best interests of the

Debtors, the bankruptcy estates and creditors in light of the fact that the Debtors require DTBA's services to maximize the value of the bankruptcy estates.

### V. Framework of the Engagement; Limitations on Scope of Engagement

22. The Debtors seek to engage DTBA to provide financial-related advisory services to the Debtors, as provided in the Engagement Letter. DTBA and Nash acknowledge they shall not take any action, or participate in activities which would cause DTBA or Nash to be deemed a "Person" within the meaning of RCRA Section 1004(15), 42 U.S.C. § 6903(15). The Debtors acknowledge that DTBA and Nash have no engineering or other expertise in environmental matters or in the compliance with RCRA, the Debtors' environmental obligations or any other issues pertaining to environmental issues or hazardous waste disposal. The Debtors have also acknowledged that they will make all appropriate decisions to comply fully with all such environmental obligations and that DTBA and Nash shall be entitled to rely on all financial information provided by the Debtors with regard to the necessary expenses and financial requirements to achieve such compliance. The Engagement will not constitute an audit, review or compilation, or any other type of financial reporting engagement subject to the rules of the AICPA or other such state and national professional bodies.

### VI. Reporting Requirements

23. To maintain transparency, DTBA will file with the Court and serve on the Debtors, the United States Trustee, counsel to the Agent for the Debtors' pre-petition and post-petition secured lenders (the "***Lenders' Agent***") and the Committee (collectively, the "***Notice Parties***") reports of compensation earned and expenses incurred on at least a quarterly basis (the "***Compensation Reports***"). The Compensation Reports will summarize the services provided, identify the compensation earned, itemize expenses incurred, and provide for an objection period. All such compensation will be subject to review by this Court if an objection were filed.

## VII. Dispute Resolution Procedures

24. The Debtors and DTBA have agreed, subject to the Court's approval of this Application, that any controversy or claim between the parties arising out of or relating to this Engagement Agreement, or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as is set forth in the applicable provisions of the Engagement Letter and below.

(a) *Mediation:* All Disputes shall first be submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

(b) *Arbitration Procedures:* If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Section 14 (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the parties shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to abide by the terms of this Section 14. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the governing law set forth in Section 16 in connection with the Dispute. The arbitrators shall have no power to award damages inconsistent with this Engagement Agreement, including the limitation on liability provisions contained herein. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. No discovery shall be permitted in connection with the arbitration, except to the extent that it is expressly authorized by the arbitrators upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to the other party and afford such party a reasonable opportunity to protect its interests.

Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

(c)  *Costs:*  Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

## LEGAL BASIS FOR RELIEF REQUESTED

25. Section 363(b) of the Bankruptcy Code provides that, after notice and a hearing, a debtor may use property of the estate other than in the ordinary course of business. "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also, In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Safety-Kleen Corp.*, No. 00-02303 (Bankr. D. Del. 2000); *In re Rangers Equity Holdings LP*, No. 10-43624 (Bankr. N.D. Tex. 2010); *In re Rangers Equity Holdings GP LLC*, No. 10-43625 (Bankr. N.D. Tex. 2010).

26. Courts have determined that retention of a chief restructuring officer is an appropriate exercise of a debtor's business judgment. *See, e.g., In re Residential Capital, LLC*, 504 B.R. 358 (Bankr. S.D. N.Y. 2014).

### I. The Debtors Have Exercised Sound and Prudent Business Judgment

27. Entry into the Engagement Letter and retaining Nash as the CRO upon the terms set forth in the Engagement Letter, this Application, and any Order approving this Application would enable the Debtors most efficiently to maximize value of the bankruptcy estates. Thus, the Debtors believe that it would be in their best interests and in the best interests of the bankruptcy estates, the creditors, and other parties-in-interest for the Court to approve the Engagement Letter and the retention of Nash as CRO in accordance with the Engagement Letter, with such retention being deemed effective as of November 10, 2014.

-11-

28. The Debtors believe that DTBA's fee structure is fair and reasonable in light of the type of services being provided and is comparable to those generally charged by firms of similar stature to DTBA for comparable engagements. In addition, given the numerous issues DTBA may be required to address in these cases, DTBA's commitment to the variable level of time and effort necessary to address all such related issues as they arise, and the market prices for DTBA's services for engagements of this nature in an out-of-court context, the Debtors believe that the DTBA fee arrangement described above is fair and reasonable.

## II.    The Proposed Retention Comports with the Bankruptcy Code

29. DTBA will provide the Notice Parties with the Compensation Reports. Because the Debtors are seeking to retain DTBA and Nash pursuant to Section 363 of the Bankruptcy Code and not under Section 327 of the Bankruptcy Code, DTBA is not subject to the compensation requirements of Sections 328, 330, and 331 of the Bankruptcy Code, and therefore, the Debtors request that the fees and expenses of DTBA incurred in the performance of the above-described services be treated as an administrative expense of the Debtors' bankruptcy estates and to be paid by the Debtors in the ordinary course of business, without the need for DTBA to file fee applications or otherwise seek Court approval for the compensation of its services and reimbursement of its expenses, other than those described above.

30. In addition, the Debtors are not seeking to retain DTBA as a professional under Section 327 of the Bankruptcy Code. Accordingly, there is no requirement for DTBA or Nash to be disinterested. *See* DANIEL F. DOOLEY ET AL., THE CHIEF RESTRUCTURING OFFICER'S GUIDE TO BANKRUPTCY: VIEWS FROM LEADING INSOLVENCY PROFESSIONALS 10 (ABI, 1st ed. 2013).

31. To the best of the Debtors' knowledge, information, and belief, however, DTBA does not have any interest materially adverse to the Debtors, the bankruptcy estates or any class of

creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason. Further, to the best of the Debtors' knowledge, information, and belief, DTBA has no connection with the Debtors, their creditors, or any other party-in-interest, except as disclosed in the Phelps Declaration.

32. Additionally, the Court's general equitable powers codified in Section 105(a) of the Bankruptcy Code provide ample authority for the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." *See* 11 U.S.C. § 105(a); *see also, United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) ("Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code."); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 166 (D.N.J. 2005) (reciting the power of the bankruptcy court to " . . . issue any order . . . that is necessary or appropriate to carry out the provisions of . . . [title 11]").

### III. *Nunc Pro Tunc* Retention

33. The Debtors submit that retroactive retention of DTBA is appropriate under the circumstances because, as described above: (i) DTBA does not have any interest materially adverse to the Debtors, the bankruptcy estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason; and (ii) extraordinary circumstances exist for *nunc pro tunc* retention, as the Debtors and DTBA have been properly focused on stabilizing the Debtors' businesses following the bankruptcy filings. *See, e.g., In re Ark. Co.*, 798 F.2d 645, 650 (3d Cir. 1986).

34. Accordingly, for the reasons set forth above, the Debtors submit that entering into the Engagement Letter is a sound and prudent exercise of their business judgment, and they believe approval thereof, and of Nash as CRO *nunc pro tunc* to November 10, 2014, is in their best interest and the best interest of the bankruptcy estates, creditors, and other parties-in-interest.

35. Further, the Debtors request that the compensation, fees and expenses allowed to be paid to DTBA be paid from the Approved Budget of the Debtors.

36. The Debtors submit that the requested relief is a sound and prudent exercise of their business judgment and is in their best interests and that of the bankruptcy estates, their creditors, and all other parties-in-interest.

## NOTICE

37. Notice of this Application shall be given to: (i) the Office of the United States Trustee; (ii) the Committee; (iii) counsel to the Lenders' Agent; (iv) all parties that have filed a request for notice pursuant to Bankruptcy Rule 2002; and (v) all counsel and parties registered on the CM/ECF system for this bankruptcy cases. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice of the Application is required.

WHEREFORE, the Debtors respectfully request that this Court enter an order approving the Debtors' retention of Deloitte Transactions and Business Analytics LLP to provide the Debtors with a Chief Restructuring Officer, and to Designate Jonathan J. Nash as the Chief Restructuring Officer for the Debtors *Nunc Pro Tunc* to November 10, 2014, all pursuant to the terms and conditions of the Engagement Letter, and to such other and further relief as may be just and proper under the circumstances.

THIS, the 18th day of November 2014.

        Respectfully submitted,

        MISSISSIPPI PHOSPHATES CORPORATION, *et al.*

        By: */s/ Stephen W. Rosenblatt*
        Stephen W. Rosenblatt (Miss. Bar No. 5676)
        Christopher R. Maddux (Miss. Bar No. 100501)
        Paul S. Murphy (Miss. Bar No. 101396)
        J. Mitchell Carrington (Miss. Bar No. 104228)
        Thomas M. Hewitt (Miss. Bar No. 104589)
        BUTLER SNOW LLP
        1020 Highland Colony Parkway, Suite 1400
        Ridgeland, MS 39157
        Telephone: (601) 985-4504
        Fax: (601) 985-4500
        Steve.Rosenblatt@butlersnow.com
        Chris.Maddux@butlersnow.com
        Paul.Murphy@butlersnow.com
        Mitch.Carrington@butlersnow.com
        Thomas.Hewitt@butlersnow.com

        ATTORNEYS FOR DEBTORS

## CERTIFICATE OF SERVICE

I certify that the foregoing pleading was filed electronically through the Court's ECF system and served electronically on all parties enlisted to receive service electronically and was separately served by e-mail on the following persons:

Office of the United States Trustee
501 East Court Street
Suite 6-430
Jackson, MS 39201
USTPRegion05.AB.ECF@usdoj.gov

Christopher J. Steiskal, Sr., Esq.
Office of the United States Trustee
501 East Court Street
Suite 6-430
Jackson, MS 39201
Christopher.J.Steiskal@usdoj.gov

David N. Usry, Esq.
Assistant United States Attorney
501 East Court Street
Suite 4-430
Jackson, MS 39201
David.Usry@usdoj.gov

Ocp S.A.
c/o Dianne Coffino
Covington & Burling, LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
dcoffino@cov.com

Trammo, Inc.
c/o James W. O'Mara
Phelps Dunbar
4270 I-55 North
Jackson, MS 39211
jim.omara@phelps.com

Premier Chemicals & Services, LLC
Francis Mayer
4856 Revere Ave., Suite A
Baton Rouge, LA 70808
francis@premierchemicals.net

Shrieve Chemical
c/o Carey Menasco
Liskow & Lewis
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, LA 70139
clmenasco@liskow.com

Central Maintenance & Welding, INc.
c/o Hugo S. "Brad" deBeaubien
Shumaker, Loop & Kendrick, LLP
Bank of America Plaza
101 East Kennedy Blvd., Suite 2800
Tampa, FL 33602
bdebeaubien@slk-law.com

Mississippi Power Company
c/o Paul J. Delcambre, Jr.
Balch & Bingham, LLP
1310 Twenty Fifth Avenue
Gulfport, MS 39501-1931
pdelcambre@balch.com

Hydrovac Industrial Services, Inc.
c/o James A. McCullough, II
Brunini, Grantham, Grower & Hewes, PLLC
P. O. Drawer 119
Jackson, MS 39205
jmccullough@brunini.com

-16-

Committee of Unsecured Creditors
c/o Derek Meek
Burr Forman
420 North 20th Street, Suite 3400
Birmingham, AL 35203
dmeek@burr.com

Committee of Unsecured Creditors
c/o Marc Solomon
Burr Forman
420 North 20th Street, Suite 3400
Birmingham, AL 35203
msolomon@burr.com

Committee of Unsecured Creditors
c/o Bess Creswell
Burr Forman
420 North 20th Street, Suite 3400
Birmingham, AL 35203
bcreswell@burr.com

SO CERTIFIED, this the 18th day of November 2014.

/s/Stephen W. Rosenblatt
STEPEHN W. ROSENBLATT